UNITED STATES of America, Plaintiff–Appellee,

v.

Joseph C. MINNEMAN and Clarence G. Punke, Defendants–Appellants.

Nos. 97–2614, 97–2676.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 16, 1998.

Decided April 17, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied May 26, 1998.

Bradley W. Murphy (argued), Office of the United States Attorney, Peoria, IL, for Plaintiff–Appellee.

David B. Mote (argued), Office of the Federal Public Defender, Springfield, IL, Richard H. Parsons (argued), Office of the Public Defender, Peoria, IL, for Defendant–Appellant Minneman.

J. Hamilton McMenamy (argued), Dallas, TX, for Defendant–Appellant Punke.

Before CUMMINGS, BAUER, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

This is a case about a businessman, Clarence Punke, who conspired with his attorney, Joseph Minneman, to hide over $700,000 from the IRS. Punke's business is the inspection, testing, servicing, and repair of pressurized vehicles and tanks. An unusual business, perhaps, but apparently a lucrative one—especially if you pay no taxes. During the three years from 1989 through 1991, Punke's gross receipts totaled nearly $790,-000. He reported income of less than $100,-000 to the IRS. Punke proudly bragged to a business associate (in a conversation overheard by the associate's wife, Sue Shank) about his success in defrauding the government. Punke explained that his attorney and friend, Minneman, put the money and assets under other names to hide them from the tax collector. Punke boasted that Minneman helped him cheat the IRS and that Minneman's knowledge of the tax laws helped Punke shuffle money around to avoid detection. Punke told another business associate that he reported only minimum wage income to the IRS, which was not smart enough to figure out the deception.

The relationship between Punke and Minneman dates back at least to 1981 when Minneman handled a bankruptcy for Punke. During the 1980's Punke did business as Punke Bros., Inc., a company that never filed tax returns and officially dissolved in 1983. In 1984 Minneman incorporated a pressurized tank business named Midwest Certified Welding and Testing ("MCWT"). Minneman filed the tax returns for this business for several years. From 1989 through 1991 Punke forwarded most of his income directly to Minneman, who deposited the funds in a long-term trust account (# 117250). Minneman regularly withdrew cash from the account and gave the money to Punke. He also purchased two trucks, a trailer, and real estate for Punke with $31,000 from the account. Minneman kept the interest on Punke's funds and transferred $42,000 of Punke's money into his own account (he wrote "client loan" on the check), later using some of the money to purchase a Cadillac. The numbers tell the story: During 1989, 1990, and 1991 Punke earned $346,273, $298,-

760, and $141,474, respectively. Punke sent Minneman $328,000, $261,000, and $100,000 for deposit in account # 117250. Apparently Punke either retained the difference or had his wife (Brenda) deposit the money in her checking account. Punke reported Schedule C business income for the years in question of $16,850, $16,425, and $17,900. On business tax returns for MCWT Minneman reported income of $9,490, $10,040, and $26,475. After the sham collapsed in 1991 MCWT reported gross receipts of over $473,000 on its 1992 tax return.

In 1991 Punke's amended personal tax return caught the IRS's attention. Punke filed the amended form to claim substantial casualty losses. The IRS noted Punke's modest business income and suspected something fishy. A civil audit was started, and as part of the investigation the IRS sent agents to question Minneman in June of 1991. The IRS requested information about Minneman's trust accounts and the source of funds for those accounts. Predictably, Minneman refused to cooperate, explaining that he could not reveal information about his clients. Minneman did furnish the IRS with a year-end summary sheet showing his law practice income. At a second meeting Minneman proved only slightly more forthcoming. He gave the IRS the checking account records from his law firm operating account. The IRS inquired about the source of some funds transferred into the operating account and Minneman explained that the money came from a trust account. When the IRS asked to inspect the trust account records, Minneman refused—again claiming privilege. The attorney explained that the IRS would have to rely on his word regarding the source of the funds. The IRS responded that it would issue a summons for the bank records. Minneman countered that the IRS could not summons an attorney's trust account records. A few weeks later Minneman partially capitulated, however. He allowed the IRS agent to inspect the monthly bank statements for two trust accounts, although he refused to provide documents to clarify the source of the funds. By November of 1991 Minneman provided access to checks and deposit slips for the trust account. Again, the IRS could not determine the source of the funds, but

the investigator noted that Minneman wrote a number of checks to cash. Minneman explained that he gave this money to the client. Once again Minneman refused to divulge the source of the funds. Finally, the case was referred to the Criminal Investigation Division of the IRS. In the meantime Punke began to invoice his customers as MCWT instead of as Punke Bros. Additionally, Punke opened a checking account for MCWT and began to claim he was the president of the company.

On August 27, 1992, the IRS criminal investigators questioned Minneman. At first Minneman refused to identify the source of the money. He stated that the money in the trust account was not his own income, although he did receive the interest on the account. Later in the discussion, however, Minneman admitted that the funds in the trust account came from Punke as revenue from MCWT. He explained that Punke owned the company and that Minneman dispersed money as requested.

The investigators questioned Punke immediately after their "interview" with Minneman. Punke explained that Dale Meier, a tax preparer from Lincoln, Illinois, filed Punke's personal returns. Punke admitted that he sent business income to Minneman (or deposited it in the new MCWT account). He said he reported as Schedule C income only the money he retained, not the income he sent to Minneman, but he later explained that he also reported the money he received from the account in lieu of a salary. Punke could not explain how he could afford to live on the income reported on his personal returns.

In his brief in this case Punke explains that the trouble all began with his bankruptcy. He faced "trouble opening bank accounts" and "[w]hen he set up bank accounts, the funds in those accounts would be garnished." Because Punke spent so much time on the road, "his inability to deposit money into an account was even more crippling than it would have been if he were not on the road." His friend Minneman helped him solve this problem by coming up with the trust account plan. Punke and Minneman

continue their mitigation efforts by explaining that Minneman had no knowledge of Brenda Punke's account. They note that Minneman never sent any information to Punke's tax preparer. In addition, they point out that Punke neglected to take several allowable business deductions from his gross income during the crucial three years.

A grand jury indicted Punke and Minneman in March of 1996, charging them with conspiracy to impede the IRS. *See* 18 U.S.C. § 371. Punke was also charged with filing false tax returns for 1989, 1990, and 1991. *See* 26 U.S.C. § 7206(1).

A jury convicted Punke and Minneman on all charges after a trial that wrapped up in 1997. Minneman received a 30–month sentence along with 3 years of supervised release. The court ordered him to pay restitution of $25,000 to the IRS. Punke received a 21–month sentence along with 3 years of supervised release. The court ordered him to pay $154,800 in restitution to the IRS. Judge Mihm ordered that liability for the restitution payments be joint and several. In calculating the amount of tax owed for purposes of restitution, the judge allowed Punke roughly half of the deductions he claimed. Because restitution was ordered, no fines were imposed. We now consider the defendants' joint appeal.

■ First, Punke and Minneman attack one of the court's rulings issued before trial. During pretrial maneuvering Judge Mihm granted the government's motion in limine prohibiting the defendants from introducing evidence of legitimate business deductions that Punke could have taken on his Schedule C from 1989 to 1991 unless Punke could first establish that he knew he could have taken the deductions before he filed his returns. The defendants claim that this ruling prevented them from presenting evidence that would refute the required mental state of willfulness, a necessary element of the offense of conspiracy to commit tax fraud. They further argue that requiring Punke to prove his knowledge as a precondition to presenting evidence undermined his right not to testify and his right to present a defense based on the actual taxes owed. As part of this argument the defendants claim that be-

cause the deductions would offset some of Punke's gross income, the jury might conclude that the defendants did not have a financial motive to defraud the government and, thus, did not knowingly falsify Punke's income on the returns. The defendants explain that evidence of the deductions would have allowed the jury to find that they acted negligently, not willfully.

■ The chief problem with this argument is that the amount of taxes owed is irrelevant to a prosecution for tax fraud. *See, e.g., United States v. Marashi*, 913 F.2d 724, 736 (9th Cir.1990). Here, Judge Mihm generously ruled that Punke could introduce evidence of the deductions if he presented some evidence of his knowledge of their availability. While the judge certainly placed a burden on the defendants, it amounted to no more than a requirement of a preliminary showing to establish admissibility rather than an erosion of the right not to testify. Furthermore, as the government correctly notes in its brief, the defense never proffered evidence of the deductions and, therefore, they seek a review of the issue in a vacuum.

■ Next, the defendants allege several problems with the government's closing argument, including factual misstatements and improper arguments. The government responds that it merely drew permissible inferences from the evidence and rebutted comments made by the defendants in their closing remarks to the jury.

First, the defendants allege error with a series of rhetorical questions posed to the jury by one of the prosecutors. The prosecutor asked why Minneman sent Punke to Meier (the tax preparer) rather than preparing Punke's taxes himself. The prosecutor then answered the question, arguing that Minneman attempted to distance himself from the fraud by letting someone without knowledge of the funds in the trust account prepare Punke's tax return. This argument, we think, was fair game because it was invited when the defense argued that had Punke and Minneman conspired, Minneman would never have let anyone else prepare the questioned tax return.

■ Second, the defendants claim error in the closing argument because one of the prosecutors explained that even though Illinois required Minneman to turn over the interest from his IOLTA (Interest on Lawyer's Trust Account) account to the state, Minneman kept the interest earned on Punke's trust account. Minneman made no contemporaneous objection to the comment, but now he argues that it violated a pretrial ruling that the government could not comment on irregularities in Minneman's IOLTA account. While the comment mentioned Minneman's IOLTA account, it only suggested that keeping the interest on Punke's account flouted Illinois IOLTA requirements. The comment did not remotely imply that Minneman mismanaged his actual IOLTA account.

■ Third, the defendants claim that the government impermissibly overstated the extent of the crime, *see United States v. Donato*, 99 F.3d 426, 432 (D.C.Cir.1996), by telling the jury that they had 708,000 reasons to convict Punke and Minneman. The defense did not object, but beyond that the comment merely responded to Minneman's attorney's creative closing ploy: "Parson's Top Ten Reasons to Acquit Minneman." Here, the magnitude of the underreporting helps establish the willfulness of the violation, for as the government notes, a $708 mistake might be an honest oversight, but a $708,000 "mistake" is more likely to be a deliberate dodge. We see nothing wrong with the prosecutor's colorful retort.

■ Fourth, the defendants claim that the prosecutor impermissibly referred to other jury decisions by stating that "[i]t has become extremely fashionable these days to ask juries to leave their common sense down here in the jury box." The defense claims that the remark "called to mind recent high profile cases, such as the first Rodney King, Menendez brothers and the O.J. Simpson trials, in which unpopular verdicts were returned." According to the defense, this comment amounted to an invitation to convict Punke and Minneman for reasons beyond the evidence. *See United States v. Severson*, 3 F.3d 1005, 1015 (7th Cir.1993). Once again, the defense did not object at trial. The government explains that it merely responded to a defense argument that the jury should weigh the evidence with reference to their observations and experiences in life, as the judge instructed, rather than their common sense. Even if the prosecution did mean to conjure up memories of outrageous acquittals, the one comment seems to us to be far too elliptical to constitute plain error.

■ With their allegations regarding error in the closing argument exhausted, the defendants turn their attention to the jury instructions. Minneman complains that the court failed to instruct on his theory of defense. Minneman's contentions stem from the prosecution's emphasis on his refusal to cooperate with the IRS during its investigation. The government characterized Minneman's conduct as "stonewalling" and painted him as engaged in a cover-up of guilty deeds. (The government counters that the comments on Minneman's conduct in closing served only to rebut the two closing argument references by the defense to Minneman as "a man with nothing to hide.") Because of the government's argument, the defense requested jury instructions on the nature of and rationale for the attorney-client privilege and the ethical duty of confidentiality. The defense contended that Minneman's sense of professional duty, rather than his involvement in crime, explained his reluctance to provide information. The defense argues that the court's refusal to give their requested instructions deprived them of the opportunity to present a theory of defense supported by the law and evidence. *See United States v. Neville*, 82 F.3d 750, 761 (7th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 249, 136 L.Ed.2d 177 (1996); *United States v. Wiman*, 77 F.3d 981, 985 (7th Cir.1996). Since the court's instructions did describe the attorney's duty of confidentiality (although at the end of instructions that focused mainly on the ability of the IRS to summons bank records and the obligation of an attorney not to disclose such information in the absence of a summons) we do not believe that the instructions viewed as a whole failed to treat the issue of the attorney-client relationship. *See United States v. McNeese*, 901 F.2d 585, 607 (7th Cir.1990). Furthermore, the in-

structions allowed the defense to argue its theory to the jury. *See United States v. Douglas*, 818 F.2d 1317, 1322 (7th Cir.1987) ("It is essential for purposes of the Fifth Amendment's requirement of a fair trial that the jury be able to evaluate . . . the adequacy of [the defendants'] theory of defense.").

■ Next, the defense contends that the government lacked sufficient evidence to convict Punke and Minneman. The defense focuses primarily on whether the government produced adequate evidence to convict Minneman—if the government lacks evidence against Minneman, its claims of a conspiracy collapse. The defense relies on *United States v. Kraig*, 99 F.3d 1361, 1368 (6th Cir.1996), for the proposition that the prosecution needs strong evidence of an attorney's knowledge of an illegal scheme to create an inference that the attorney willingly participated in that crime. In *Kraig*, however, the Sixth Circuit rejected a special standard for attorneys. Nevertheless, according to the defense, the government lacked evidence of Minneman's involvement in the preparation of Punke's tax returns. On the contrary, the prosecution presented strong evidence of: Minneman's involvement in Punke's business; Minneman's multiple deposits of Punke's income in the trust account; Minneman's distribution of funds; Minneman's transfer of funds to purchase a Cadillac; Minneman's collection of interest on the trust account; Minneman's false tax returns for MCWT; and Minneman's purchase of business equipment for Punke. And because the court instructed the jury to consider Sue Shank's testimony only with regard to Punke (and not Minneman), we do not consider Shank's testimony regarding Punke's boasts about Minneman and their ability to pull the wool over the eyes of the IRS in weighing the evidence against Minneman. But, even absent Shank's testimony about Punke's remarks, the government presented enough evidence for a rational jury to infer Minneman's involvement in a tax avoidance conspiracy. *See United States v. Pearson*, 113 F.3d 758, 761 (7th Cir.), *cert. denied*, ——— U.S. ———, 118 S.Ct. 641, 139 L.Ed.2d 619 (1997).

■ The defendants also raise several challenges to their sentences. First, they argue that Judge Mihm erred in requiring them to choose between the 1991 guidelines, in effect at the time of the offenses, and the 1996 guidelines, in effect at the time of the sentencing proceeding. The defendants chose to apply the 1991 guidelines. We think the district court was correct in its application of the 1991 guidelines, whether by the choice of the defendants or otherwise.

The 1991 guidelines, corresponding to the date of the offense, carried a base offense level of 14. The 1996 guidelines carried a base offense level of 16. This 2–level increase arose on November 1, 1993, as part of an amendment which consolidated and revised many of the guidelines applicable to tax offenses. *See* U.S.S.G. App. C, Amendment 491, pp. 385–395.

■ The general rule, of course, is that the court uses the guidelines in effect on the date that a defendant is sentenced. U.S.S.G. § 1B1.11(a). But an old guideline should be used if the new one raises ex post facto concerns. *See United States v. Aman*, 31 F.3d 550, 557 (7th Cir.1994).

Because the amended guidelines (1996) provided a 2–level increase in the offense level over the 1991 guidelines, the district court could abandon the 1996 guidelines as violative of the Ex Post Facto Clause and apply the 1991 guidelines to the benefit of the defendants. On top of that, the defendants chose the 1991 guidelines when asked by the district judge, and that choice is a waiver of any complaint that the 1991 guidelines should not have applied.

■ The defendants actually sought the application of a portion of the 1996 guidelines along with the lower base offense level from the 1991 guidelines. They sought to reduce the tax loss (and thus the base offense level) by the application of language in the 1996 guideline that was added in 1993 by Amendment 491. At sentencing, the guideline read, in pertinent part:

(A) If the offense involved filing a tax return in which gross income was underreported, the tax loss shall be treated as equal to 28% of the unreported gross in-

come (34% if the taxpayer is a corporation) plus 100% of any false credits claimed against tax, unless a more accurate determination of the tax loss can be made. U.S.S.G. § 2T1.1(c)(1)(A). Amendment 491 had taken a portion of the language of § 2T1.3 (now deleted) and added "unless a more accurate determination of the tax loss can be made." U.S.S.G.App. C, Amendment 491, p. 386. The defendants sought a piecemeal application of the most favorable portions of the 1991 guidelines and a favorable portion of the 1996 guidelines. The defense argued that Amendment 491 was a clarifying amendment and, as such, could be applied to their sentencing. Judge Mihm correctly rejected this offer to apply the guidelines in a piecemeal fashion, for the guidelines cover this situation:

> The Guidelines Manual in effect on a particular date shall be applied in its entirety. The court shall not apply, for example, one guideline section from one edition of the Guidelines Manual and another guideline section from a different edition of the Guidelines Manual. However, if a court applies an earlier edition of the Guidelines Manual, the court shall consider subsequent amendments, to the extent that such amendments are clarifying rather than substantive changes.

U.S.S.G. § 1B1.11(b)(2).

Judge Mihm correctly found that the new language of § 2T1.1(c)(1)(A) was not a clarifying amendment. The new definition of tax loss in Amendment 491 was a significant departure from the 1991 definition found in the now defunct § 2T1.3(a). Some of the language (i.e., percentages) was carried over. Some of the language (referring to taxable income) was deleted altogether. The phrase "unless a more accurate determination of the tax loss can be made" is new to the definition. The sentencing commission stated that one of the purposes of Amendment 491 was to adopt a "uniform definition of tax loss" where none had previously existed. U.S.S.G.App. C, Amendment 491, p. 395.

The defendants claim that the Court of Appeals for the Sixth Circuit, in an unpublished opinion, held that Amendment 491 clarifies the definition of tax loss. True to an extent, but the court did not hold that all of Amendment 491 was clarifying, nor did it deal with the new definition of "tax loss" found at § 2T1.1(c)(1)(A).

■ We have, on a number of occasions, decided whether guideline amendments are "clarifying" or "substantive." In *United States v. Lykes*, 999 F.2d 1144 (7th Cir.1993), an application note to § 4B1.2 (career offender) was held to be a substantive amendment because it changed existing case law as it had been interpreted by every appellate court to consider the language of the guideline. *Id.* at 1150; *see* U.S.S.G. § 4B1.2, comment. (n.2). The application note changed the definition of "crime of violence" to exclude the offense of unlawful possession of a firearm by a felon. One factor pointing toward finding a substantive amendment is whether an important substantive definition is altered.

In *Ebbole v. United States*, 8 F.3d 530 (7th Cir.1993), *cert. denied*, 510 U.S. 1182, 114 S.Ct. 1229, 127 L.Ed.2d 573 (1994), the defendant sought the benefit of a third point for acceptance of responsibility, added by an amendment to the guidelines. We noted that the amendment altered the language of the guideline itself by adding the third point to § 3E1.1. Because the amendment changed the language as to what constituted acceptance of responsibility and had the effect of reducing offense levels, we held it to be a substantive amendment. *Id.*

In finding that Amendment 500 clarified § 3B1.1 (role in the offense), we explained that the application note (U.S.S.G.§ 3B1.1, comment.(n.2)) neither changed the language of the guideline nor imposed an unreasonable interpretation of its plain language. *United States v. Fones*, 51 F.3d 663, 669 (7th Cir. 1995). So in deciding between calling an amendment substantive or clarifying, we have looked closely at the language of the change.

■ In one case from the Fifth Circuit, § 2T1.1(c)(3) (added by Amendment 491) was referred to as a clarifying amendment without discussion. *United States v. Clements*, 73 F.3d 1330, 1339 n. 14 (1996). We take no issue with that conclusion, as far as it goes, because certain provisions of Amendment

491 are "clarifying" in nature. The new definition of "tax loss," however, is a substantive change. It uses some language from the discarded § 2T1.3, deletes some wording, and adds new language. It altered a key definition (tax loss) by changing the actual wording of the guideline itself, and the effect is a lowering of offense levels when proper proof is produced. Under the new definition, which allows the court to inquire into the actual tax burden, the authority of the court is expanded to accept proof showing a lesser amount of taxes owed. As in *Lykes* and *Ebbole,* when a key phrase is defined or redefined by changing the guideline itself, and the effect is to change offense levels, the amendment is substantive. Section 2T1.1(c)(1)(A) substantively redefined the term "tax loss," and Judge Mihm was correct when he declined to consider the new definition pursuant to U.S.S.G. § 1B1.11(b)(2).

The defendants' second attack focuses on Judge Mihm's decision to enhance the defendants' sentences for use of sophisticated means. The defense claims that the tax fraud scheme was simple, not complex—Minneman did nothing sophisticated by merely depositing money in the trust account. Thus, the court should not have enhanced the sentences under U.S.S.G. § 2T1.1(b)(2) (1991), the "sophisticated means" enhancement for "conduct that is more complex or demonstrates greater intricacy or planning than a routine tax-evasion case." *Id.* in commentary. The defense loses this point right out of the gate. Compared to simply not reporting income, the use of multiple corporate names (one officially defunct) and the placement of funds in a trust account both constitute complex efforts to hide income. *See, e.g., United States v. Becker*, 965 F.2d 383, 390 (7th Cir.1992) (efforts to make income untraceable, such as deposits into an account without a defendant's name or social security number, constitute sophisticated means).

Next, Minneman launches a two-pronged challenge to the propriety of the court's enhancement of his sentence for the use of special skill. *See* U.S.S.G. § 3B1.3. Minneman claims that he did not use his legal education to significantly facilitate the offense and he argues that application of the special skill and the sophisticated means enhancements constituted impermissible double counting of identical conduct. *See United States v. Haines*, 32 F.3d 290, 293 (7th Cir. 1994).

The government counters the first argument by reminding us that Minneman thwarted the IRS by claiming attorney-client privilege, using his knowledge of tax law to file returns for MCWT, and using his knowledge of trust law to set up the client trust account. Generally, the government notes, a special skill need not relate directly to the offense of conviction. *See United States v. Graham*, 60 F.3d 463, 469 (8th Cir.1995) (enhancing sentence of lawyer who used knowledge of trust instruments to conceal assets, and make false statements, during his own bankruptcy). Regarding the double counting claim, it's true that the factual basis for the two adjustments may overlap somewhat. But so long as the court finds a sufficient independent factual basis for both adjustments, it may impose both. *Haines*, 32 F.3d at 293. Here, the facts underpinning the special skill enhancement differ sufficiently from the facts supporting the sophisticated means enhancement. The special skill adjustment focuses on Minneman's use of his legal training. The sophisticated means enhancer arises because of the use of multiple accounts and corporate names. Thus, both enhancements could be invoked.

Finally, Punke challenges Judge Mihm's restitution order. Punke argues that the government lacked the authority to seek the order without first providing a notice of tax deficiency as required under the tax laws. *See Laing v. United States*, 423 U.S. 161, 96 S.Ct. 473, 46 L.Ed.2d 416 (1976); 26 U.S.C. § 6213(a). Punke also claims that the government obtained an impermissible declaratory ruling on a tax matter by bringing a criminal suit. *See* 28 U.S.C. § 2201(a). Punke seems to take this argument even further by alleging that the court itself lacked jurisdiction to hear a criminal tax case in which it might determine the amount of tax loss. Punke wraps up these novel argu-

ments by asserting that the entire proceeding violated his due process rights.

Punke's innovative arguments entirely misperceive the essential difference between limitations on the government's power to proceed civilly against violators of the tax laws and the government's power (and court's jurisdiction, *see* 18 U.S.C. § 3231) to seek criminal convictions of those who violate the criminal laws. Nothing in the requirements of the civil tax process or in the limitations on a court's power to hear declaratory judgment actions prevents the government from bringing or the court from hearing a criminal tax case. Nevertheless, we will examine Judge Mihm's restitution order to ensure that it comports with all requirements.

 The judge ordered restitution using the powers conferred by Congress under the Victim and Witness Protection Act ("VWPA"). *See* 18 U.S.C. §§ 3663, 3664 (1996) (made applicable to this case by 18 U.S.C. § 2248 (note of effective date)). Under this circuit's precedent, a government agency—such as the IRS—qualifies as a victim under the VWPA. *See United States v. Martin*, 128 F.3d 1188, 1190–93 (7th Cir. 1997); *United States v. Fountain*, 768 F.2d 790, 802 (7th Cir.1985). The VWPA empowers courts to impose restitution as part of a sentence rather than just as a special condition of probation. *See Martin*, 128 F.3d at 1190. Notably, the VWPA does not authorize a court to order restitution for Title 26 offenses—tax offenses. *See United States v. Gottesman*, 122 F.3d 150, 151 (2d Cir.1997); *United States v. Stout*, 32 F.3d 901, 905 (5th Cir.1994). However, the statute explicitly allows restitution for any violation of Title 18—criminal offenses. Here, the jury convicted Punke and Minneman of conspiracy under 18 U.S.C. § 371. As the Second Circuit explained in *United States v. Helmsley*, 941 F.2d 71, 101 (1991), the VWPA applies because conspiracy is a separate crime from the underlying predicate act, and nothing in the statute limits a court's power to order restitution after a conviction for conspiracy is recorded.

 The only remaining question is whether the court properly determined the amount of restitution. An examination of the VWPA will help us considerably in answering this question. In 1996 Congress amended the VWPA by adding a panoply of procedures to aid a district court in determining the amount of loss. *See* Act of April 24, 1996, Pub.L. No. 104–132, Title II, Subtitle A, § 206(a), 110 Stat. 1232. These amendments demonstrate several important points: Congress contemplated that a restitution order might require a district court to resolve complex questions regarding the amount of loss. Notably, Congress left the choice of procedures to the discretion of the court. Crucially, Congress provided no limitations on the court's authority to determine the appropriate amount of restitution. In sum, the structure of the VWPA and especially the 1996 amendments demonstrate a congressional intent to provide an expansive and powerful remedy. *See Martin*, 128 F.3d at 1190 (explaining that the history of the VWPA is not "marked by steady congressional erosion, but rather by constant expansion of the restitution remedy").

The amended VWPA provides several procedural options for the court to obtain the evidence necessary to determine the amount of restitution. The starting point is the presentence report (or, at the court's discretion, a separate report) providing "information sufficient for the court to exercise its discretion in fashioning a restitution order." 18 U.S.C. § 3664(a). This report includes "to the extent practicable, a complete accounting of losses to each victim." *Id.* If the judge finds the presentence report lacking, "the court may require additional documentation or hear testimony" to determine the amount of loss. § 3664(d)(4). If, 10 days before sentencing, the victim's losses remain unascertainable, the court shall postpone the final determination of the amount of loss for up to 90 days. *See* § 3664(d)(5). The court may amend a restitution order if the victim discovers additional losses and shows good cause for failing to include those losses in the initial claim for restitutionary relief. *See id.* And the court may refer any issue, including the amount of loss, "to a magistrate judge or special master for proposed findings of fact." § 3664(d)(6).

In addition to these procedural options, the VWPA spells out the standards for determining the amount of restitution and the long-term effects of such an order. Foremost, the statute gives the court the authority to resolve any dispute over the amount of loss under a preponderance standard with the burden of proof on the government. See § 3664(e). Once the court determines the amount of loss, the statute directs the judge to order restitution "in the full amount of each victim's losses." § 3664(f)(1)(A). The statute empowers the court to make each defendant liable for the full amount of loss or apportion the loss among the defendants. See § 3664(h). The VWPA provides for the reduction of any restitution order based on any recovery by the victim from insurance or through civil proceedings. See § 3664(j). (Thus, addressing a concern raised by the dissent in *Helmsley. See* 941 F.2d at 107 (Oakes, C.J., dissenting).) Finally, the law estops the defendant from "denying the essential allegations" of the offense in any subsequent civil proceeding brought by the victim. § 3664(*l*).

■■■ Although this circuit does not require specific findings of fact to support a restitution award, we have urged district courts to provide articulated findings in order to facilitate appellate review. *See United States v. Menza*, 137 F.3d 533, 537–38 (7th Cir.1998). Importantly, while detailed findings are preferable, they are not mandatory. *See United States v. Zaragoza*, 123 F.3d 472, 479 n. 5 (7th Cir.) (citing several cases for the proposition that "this Court has noted repeatedly that § 3664 does not require express findings as to each and every factor"), *cert. denied,* —— U.S. ——, 118 S.Ct. 317, 139 L.Ed.2d 245 (1997). But if a district court does not provide detailed findings, it runs the risk that we may remand a restitution award based on "inadequate explanation and insufficient reasoning." *See Menza*, 137 F.3d 533, 538.

Here, the district court determined that, for purposes of restitution, the amount of tax loss differed from the amount of loss used to calculate the offense level. The discrepancy arose because Judge Mihm included approximately half of Mr. Punke's alleged business deductions from gross income when calculating the amount of loss for restitution while he rejected consideration of the deductions when calculating the offense level under the 1991 guidelines (see above). This split decision is not the product of an inconsistent ruling, but rather a quirk in the sentencing laws. Judge Mihm gave the defendants a choice regarding which set of guidelines should apply. The defendants chose the 1991 guidelines because those rules resulted in a lower offense level even though they prevented the defendants from taking deductions. When determining the amount of restitution, however, Judge Mihm allowed the defendants to take deductions. In sum, the defendants received favorable treatment at each stage of the proceeding. This incongruity does not undermine the validity of the court's restitution order. On the contrary, Judge Mihm followed the VWPA by determining the actual amount of tax loss-rather than applying an arbitrary formula from the 1991 guidelines—before ordering restitution. He conducted a hearing after he received the presentence report. He heard the defendants on the issue of deductions. He issued a factual finding, supported by the evidence, regarding the amount of loss for purposes of restitution. He explained his reasoning on the record. We ask for no more. Nothing in Judge Mihm's decision indicates inadequate explanation or insufficient reasoning.

■■■ But we add that this case does differ from most restitution cases because it involves restitution for a tax loss. We certainly know that the tax laws provide elaborate procedures for determining a taxpayer's civil liability. *See* 26 U.S.C. §§ 6212(a), 6213. And we recognize that many circuits, including this one, once limited a district court's power to order tax restitution under the old Probation Act. *See United States v. Weber*, 437 F.2d 1218 (7th Cir.1971). Congress repealed the Probation Act, however. It has now been replaced by the VWPA and the federal sentencing guidelines. The amendments to the VWPA evince a congressional intent to expand the district court's ability to determine the amount of restitution. The statute contemplates that on occasion the district court may need complex procedures to determine the amount of loss with accura-

cy. Clearly, the statute grants the district court the authority to determine when to invoke those procedures and which of the many options to choose. We are sure that many nontax cases may present far more difficult questions regarding the amount of loss than commonly found in tax cases. Nothing in the statute suggests that Congress contemplated special procedures ·for tax loss or any other specific kind of loss. We, therefore, review a district court's choice of procedures for determining the amount of loss and the court's calculation of the amount of restitution under the normal standard— abuse of discretion. Typically, we examine the ruling to ensure that the judge acted on accurate information, determined the amount of loss with appropriate certainty, and provided the defendant with an opportunity to be heard on the question of the amount of loss. *See United States v. Mischler*, 787 F.2d 240, 247 (7th Cir.1986).

In this case, apparently, Judge Mihm felt no need to avail himself of the various novel approaches offered by the VWPA. At the sentencing hearing the judge determined the amount of tax loss based on information from the parties and from the presentence report. Nothing in this case leads us to believe that Judge Mihm abused his discretion or stepped beyond his statutory powers in determining the amount of restitution.

For the foregoing reasons, we AFFIRM the conviction and sentences of Clarence Punke and Joseph Minneman.