NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0050n.06

Case No. 22-1240

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| | ) | **FILED** |
| UNITED STATES OF AMERICA, | ) | Jan 24, 2023 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| JOSHUA LOUIS RUPP, | ) | MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | OPINION |

Before: STRANCH, MURPHY, and DAVIS, Circuit Judges.

MURPHY, Circuit Judge. Pretending to be a licensed securities broker, Joshua Rupp defrauded his in-laws and friends of a total of $2.7 million. Among other tricks, Rupp downloaded an app onto his victims' phones so that they could monitor "dummy" accounts showing excellent (but fictitious) gains. Rupp pleaded guilty to securities fraud. During plea negotiations, the government estimated that his guidelines range would be about 10 to 12 years' imprisonment. Yet the district court calculated his range to be significantly higher and sentenced him to 16 years.

Rupp argues that he entered an unknowing and involuntary plea because his decision to plead guilty turned on the government's mistaken estimate of his guidelines range. Rupp next argues that the district court should not have increased his guidelines range with an enhancement that covers those who use "sophisticated means" to commit fraud. He lastly argues that the court imposed a substantively unreasonable sentence. But his plea agreement and plea colloquy both

show that Rupp knew that he could not void his plea simply because the district court chose a higher-than-expected guidelines range. Rupp also used plenty of "sophisticated" means, including the creation of the dummy accounts. And his plea agreement waived his right to bring a substantive-reasonableness challenge to his sentence. We affirm.

I

Rupp grew up in a loving home in western Michigan. By 2011, he appeared to be on a relatively successful path both personally and professionally. He had married his wife and had two kids. He had also obtained a builder's license and started a home-building company in Texas. In that year, Rupp and his family returned to Michigan. While back in his home state, he began working as an RV salesperson.

Things changed significantly in 2015 when Rupp turned to securities fraud. He swindled family and friends alike of millions of dollars over the next four years. Rupp targeted his wife's parents as his first victims. His in-laws initially gave him a small sum after he led them to believe that he had connections with a fictitious broker at an established financial-services firm. Rupp's father-in-law later allowed Rupp to manage the substantially more money in his IRA (about $465,000). Rupp's in-laws also helped to convince his wife's grandmother to invest with him. Rupp almost took $1.2 million from her, but the bank suspected Rupp of elder fraud and placed a hold on the check that she had written. When his in-laws went to the bank to discuss the situation, they learned that Rupp had withdrawn all of the funds from his father-in-law's IRA. Rupp wasted all of these funds, causing his wife's parents to suffer significant tax consequences in the process. His marriage did not survive his fraud.

That fraud soon expanded outside his family. He would promote his (fake) qualifications to people that he met at places like his family's church. Once these friends agreed to make

investments with him, he would install a trading app on their phones to allow them to track their investments. The app showed extraordinary gains from week to week, which led his victims to spread the word about Rupp's investment prowess. Like Rupp's father-in-law, some of these investors gave Rupp access to their retirement accounts, including accounts worth over $400,000.

Apart from the app that he downloaded onto his victims' phones to monitor the "dummy accounts" that he had created, Rupp engaged in many other fraudulent acts to persuade them to invest with him. Plea Agreement, R.6, PageID 15–17. He claimed to be a licensed broker. (He was not.) He claimed to work for established financial-service firms. (He did not.) He claimed that the victims could not lose the principal that they entrusted to him because of the nature of his investments. (They lost nearly all of it.) And he showed his victims many authentic-looking documents, including a broker's license and account statements with letterhead and logos from the established financial-service firms. (He had forged these documents.)

Ultimately, Rupp's mounting investment losses and growing addiction to cough syrup took a toll on his mental health. His fraud scheme unraveled when he suffered a mental breakdown one day in late July 2019. After overconsuming cough syrup, a naked Rupp trespassed into the homes of strangers, assaulted the residents, and engaged in other bizarre behavior. He fled in his car from one of the homes, swerved into an approaching vehicle, and hit its trailer. The police had to use a taser to subdue him. While in custody, Rupp admitted to his fraud.

All told, Rupp took more than $2.7 million from 19 people. He spent at least $500,000 of this money on vacations, groceries, and other personal expenses. He frittered away the rest on bad stock trades.

The government charged Rupp with securities fraud in violation of 18 U.S.C. § 1348(1). He pleaded guilty. As part of his plea agreement, Rupp acknowledged that the parties had not

reached a consensus on how to calculate his guidelines range. He also recognized that neither the government nor his counsel nor even the court could make a "binding prediction or promise" concerning the length of the court's sentence and that he could not withdraw his plea even if the court imposed the statutory maximum. Plea Agreement, R.6, PageID 22. And he agreed to waive his right to appeal except on a few specified grounds, including that his plea was unknowing and involuntary and that the district court had miscalculated his guidelines range.

At Rupp's plea hearing, a magistrate judge found that he had entered a knowing and voluntary guilty plea. Before doing so, the judge confirmed that Rupp understood the nature of the charges and the potential punishment. Rupp recognized that only the district court could determine his guidelines range. He also conceded that nobody had promised him what sentence the court would choose. And he agreed that he could not withdraw his plea if it turned out that the court chose a sentence longer than he anticipated.

Rupp's presentence report recommended that the court impose four enhancements to his base offense level. It recommended a two-level enhancement because Rupp had used "sophisticated means" to commit the fraud. U.S.S.G. § 2B1.1(b)(10)(C). It recommended an 18-level enhancement because of the amount of the loss. *Id.* § 2B1.1(b)(1)(J). It recommended a four-level enhancement because Rupp's crime had caused "substantial financial hardship" to at least five victims. *Id.* § 2B1.1(b)(2)(B). And it recommended a four-level enhancement because Rupp's crime had involved "securities law" and he qualified as an "investment adviser." *Id.* § 2B1.1(b)(20)(A)(iii).

At sentencing, Rupp's counsel argued against the sophisticated-means enhancement on the ground that its application, when combined with the other enhancements, would result in improper "double counting" by punishing him twice for the same conduct. Sentencing Hr'g Tr., R.45,

PageID 213. He reasoned that violation of the securities laws is always sophisticated. The court disagreed. It found that Rupp had used sophisticated means by creating "false documents" to defraud his victims. *Id.*, PageID 222. It further noted that this enhancement did not overlap with his enhancement for violating the securities laws because not all such frauds are sophisticated. *Id.*

Adopting the presentence report's calculations, the court concluded that Rupp's guidelines range was 168 to 210 months' imprisonment. When speaking to the court, Rupp suggested that the report's recommended range had caught him "off guard" because the government in plea negotiations had predicted that his range would be 10 to 12 years. *Id.*, PageID 237. The court nevertheless chose a sentence of 192 months' imprisonment. This choice led Rupp to interrupt: "I just don't agree with your sentence." *Id.*, PageID 247. He opined that "child sex molesters and rapists" serve shorter sentences and that his victims had asked him to invest their money. *Id.* Describing the sentence as "ridiculous," Rupp added: "I wouldn't have taken this plea agreement if I knew you were going to give me more than 12 years. I took the plea agreement based on [the prosecutor] sending over the thing that said it was 10 to 12 years, those are my guidelines, so I'm here today because of that." *Id.*, PageID 248. When the court told him he would have the opportunity to appeal, he responded: "Oh, I will." *Id.*

## II

Rupp raises three arguments on appeal. He argues that his guilty plea was not knowing and voluntary. He argues that the district court should not have used the sophisticated-means enhancement. And he argues that the court imposed a substantively unreasonable sentence.

1. *Knowing and Voluntary Plea*. Rupp first claims that he entered an unknowing and involuntary plea. Specifically, he says that his decision to plead guilty rested on the government's

prediction during their plea negotiations that his guidelines range would fall between 10 and 12 years—well below the range that the district court determined (14 to 17.5 years).

We start with two procedural issues. The first: our standard of review. Generally, we review de novo a district court's conclusion that a defendant knowingly pleaded guilty, and we review for clear error any factual findings underlying this conclusion. *See United States v. Catchings*, 708 F.3d 710, 716 (6th Cir. 2013); *United States v. Walker*, 160 F.3d 1078, 1095–96 (6th Cir. 1998). Here, however, the government argues that Rupp never asserted in the district court that his plea had been unknowing, and it points out that we review unpreserved arguments of this type under the deferential plain-error test. *See United States v. Hobbs*, 953 F.3d 853, 857 (6th Cir. 2020); *United States v. Swinney*, 728 F. App'x 485, 487 (6th Cir. 2018). Rupp counters that he preserved the argument with his comment that he would not have pleaded guilty if he had known his sentence would exceed the 12 years that the government had estimated. We need not decide whether Rupp adequately raised this claim because our standard of review does not matter to the outcome. We will assume that the normal standard applies.

The second: the record on appeal. Rupp's argument rests on discussions from the parties' plea negotiations that he did not introduce into evidence. At most, he made a passing (unsworn) statement that the prosecutor had sent him a letter identifying the government's estimate of his guidelines range as 10 to 12 years' imprisonment. Sentencing Hr'g Tr., R.45, PageID 237. We typically limit ourselves to the record on appeal and save for collateral review arguments that require outside-the-record evidence. *See* Fed. R. App. P. 10(a); *United States v. Ferguson*, 669 F.3d 756, 762–63 (6th Cir. 2012); *United States v. Wagner*, 382 F.3d 598, 615 n.4 (6th Cir. 2004). Yet the government concedes that, during plea negotiations, it estimated that Rupp's offense level would be 30 and his criminal history category would be III—estimates that would produce a

guidelines range of 121 to 151 months. Appellee's Br. 21–22; U.S.S.G. Ch. 5 Pt. A. But Rupp's offense level turned out to be 32 and his criminal history category turned out to be IV. Because the parties do not dispute the basic facts, we need not decide how this lack of evidence should affect things.

With these issues to the side, we turn to the merits. When defendants plead guilty, they waive many constitutional rights, including the right to a jury trial and the right to confront accusers. *See Parke v. Raley*, 506 U.S. 20, 29 (1992). So the Constitution and the Federal Rules of Criminal Procedure place limits on a district court's ability to accept a plea. The Due Process Clause prohibits defendants from waiving these rights unless they do so in a "knowing" and "voluntary" manner. *Id.* at 28–29; *see Brady v. United States*, 397 U.S. 742, 748 (1970). And Rule 11 requires a court to ask a series of questions to defendants at a plea hearing to ensure their knowledge of several items. *See United States v. Day*, 2022 WL 17547518, at *2 (6th Cir. Dec. 9, 2022); *United States v. Webb*, 403 F.3d 373, 378–79 (6th Cir. 2005). Courts must ensure, among other things, that they know of their potential punishments. *See* Fed. R. Crim. P. 11(b)(1).

When defendants receive a sentence higher than the one that they anticipate, they often argue that they did not enter a knowing and voluntary plea because their decision to plead guilty rested on their mistaken sentencing prediction. We have regularly rejected this type of challenge. *See United States v. Davis*, 796 F. App'x 886, 890 (6th Cir. 2019); *United States v. Contreras-Armendariz*, 207 F. App'x 594, 596–97 (6th Cir. 2006); *United States v. Hernandez*, 1999 WL 486620, at *3–5 (6th Cir. July 1, 1999) (per curiam); *Gessa v. United States*, 1993 WL 72487, at *1 (6th Cir. Mar. 15, 1993) (order); *see also United States v. Lewis*, 800 F. App'x 353, 358–59 (6th Cir. 2020); *United States v. Stephens*, 906 F.2d 251, 253 (6th Cir. 1990). When the plea agreement or plea colloquy explains to a defendant that any earlier sentencing estimate represented

only a nonbinding prediction, the defendant does not enter an unknowing and involuntary plea merely because the "prediction" does not come true. *Davis*, 796 F. App'x at 890 (quoting *Stout v. United States*, 508 F.2d 951, 953 (6th Cir. 1975)); *see also, e.g.*, *United States v. Patterson*, 576 F.3d 431, 438 (7th Cir. 2009); *United States v. Bond*, 135 F.3d 1247, 1248 (8th Cir. 1998) (per curiam); *United States v. Garcia*, 909 F.2d 1346, 1348 (9th Cir. 1990).

This rule dooms Rupp's claim. His plea agreement and plea colloquy both show that he knew that any earlier sentencing estimate would not bind the court and that he could not void his plea if the estimate turned out to be wrong. First consider his plea agreement. It informed Rupp that the parties had "no agreement as to the applicable Guidelines factors or the appropriate Guidelines range." Plea Agreement, R.6, PageID 19. It added that the government could "seek any sentence within the statutory maximum" and "argue for any criminal history category and score, offense level, specific offense characteristics, adjustments, and departures." *Id.* The agreement also informed Rupp that the district court had the final say over the guidelines range. *Id.* And it told him that his "disagreement" with the court's chosen "range or sentence shall not constitute a basis for withdrawal of the plea." *Id.* Lastly, a "merger" clause explained that he could not rely on outside-the-text "promises." *Id.* PageID 23. When signing his name, Rupp declared that he had read the agreement, that he understood its "terms," that he "voluntarily" agreed to them, and that the government had made no other "promises or inducements" to get him to plead guilty. *Id.*, PageID 24. As we recognized in another case that included a similar signed declaration in a plea agreement, Rupp's signature "acknowledg[ing]" that he had read the agreement and that he was "voluntarily" agreeing to its terms supports the finding that he entered a knowing and voluntary plea. *United States v. Taylor*, 281 F. App'x 467, 469 (6th Cir. 2008).

Next consider the colloquy with the magistrate judge at the plea hearing. Rupp understood that the district court could impose a sentence up to 25 years' imprisonment for his offense. Tr., R.26, PageID 63. He acknowledged that "only" the district court could "determine" his guidelines range and that the court could vary upward from this range when imposing a sentence. *Id.*, PageID 64, 66. He agreed that the government had not made "any promises" about what sentence the court would choose, *id.*, PageID 66, an agreement that bars him from now "relying on an alleged oral promise by the government" about the sentence, *Ewing v. United States*, 651 F. App'x 405, 409–10 (6th Cir. 2016). Rupp further answered "[y]es" when asked if he recognized that he would not "be able to withdraw" his plea simply because his "sentence is more severe than [he thought] it might be" while at the plea hearing. Tr., R.26, PageID 66. As we have explained in other cases rejecting claims that a guilty plea was not voluntary because of the defendant's allegedly mistaken belief about the likely sentence, Rupp remains bound by his sworn statements that he understood that the district court would determine his guidelines range and that he could not void his plea if it chose a higher-than-anticipated sentence. *See United States v. Presley*, 18 F.4th 899, 905 (6th Cir. 2021); *see also Lewis*, 800 F. App'x at 359; *Contreras-Armendariz*, 207 F. App'x at 596–97.

In response, Rupp does not cite a single Sixth Circuit decision to support his argument that the government's estimate rendered his guilty plea unknowing. He instead turns to the Second Circuit. But the cases on which he relies concerned a different issue—whether the government had breached a plea agreement when it advocated for a higher guidelines range than the one referred to in the agreement. *See United States v. Wilson*, 920 F.3d 155, 163–65 (2d Cir. 2019); *United States v. Palladino*, 347 F.3d 29, 34 (2d Cir. 2003). Because the agreements in these cases noted that their estimates incorporated the information that the government knew at that time, the court read them to allow the government to seek other enhancements based only on new

9

information. *See Palladino*, 347 F.3d at 33–34. No similar breach occurred here. Rupp's plea agreement indicated that the government could argue for any sort of enhancement without limit. Plea Agreement, R.6, PageID 19; *cf. United States v. Sweeney*, 878 F.2d 68, 70 (2d Cir. 1989) (per curiam). Because Rupp has shown only a mistaken estimate and because his plea agreement and plea colloquy made clear that the estimate would not bind the district court, he knowingly and voluntarily pleaded guilty.

2. *Sophisticated-Means Enhancement*. Rupp next challenges the district court's decision to apply the sophisticated-means enhancement in U.S.S.G. § 2B1.1(b)(10)(C). This two-level enhancement applies to a fraud offense that "involved sophisticated means" if "the defendant intentionally engaged in or caused the conduct constituting sophisticated means[.]" *Id.* In other words, the defendant must have undertaken a "highly complex, refined, or developed" fraud. *Webster's New World College Dictionary* 1386 (5th ed. 2020); *see also* 16 *Oxford English Dictionary* 10 (2d ed. 1989). This "especially complex" fraud includes tactics like using "fictitious entities" or "corporate shells" to hide "assets or transactions[.]" U.S.S.G. § 2B1.1 cmt. 9(B).

Before turning to Rupp's arguments, we flag a conflict in our caselaw over the standard of review. There is no dispute that we review a district court's findings about the historical facts (such as a finding about what a defendant did to conceal the fraud) for clear error, and we review the court's conclusions about abstract legal questions (such as a conclusion about the meaning of the word "sophisticated") de novo. *See United States v. Bertam*, 900 F.3d 743, 752–53 (6th Cir. 2018); *see also United States v. Thomas*, 933 F.3d 605, 608 (6th Cir. 2019). But what standard applies to the mixed question of whether the historical facts satisfy the legal definition of "sophisticated means"? Sometimes, we have reviewed this question de novo. *See, e.g.*, *United States v. Daulton*, 266 F. App'x 381, 388 (6th Cir. 2008). Other times, we have reviewed it for

clear error. *See, e.g.*, *United States v. Thomas*, 841 F. App'x 934, 938 (6th Cir. 2021). Because Rupp's challenge fails even under de novo review, we need not resolve this issue today. *See Thomas*, 933 F.3d at 610.

In fact, Rupp does not dispute that this enhancement presumptively would apply to his misconduct. Our cases have upheld its use for a defendant who created "false insurance certificates" in an insurance-fraud scheme. *United States v. Crosgrove*, 637 F.3d 646, 667 (6th Cir. 2011). They have upheld its use for a defendant who used "fictitious identification numbers" and a "dormant account" to conceal theft from a credit union. *United States v. Simmerman*, 850 F.3d 829, 833 (6th Cir. 2017). And they have upheld its use for defendants who ran a Ponzi scheme by using "fraudulent bank documents" and "fictitious website information[.]" *United States v. Phelps*, 2021 WL 4315947, at *6 (6th Cir. Sept. 23, 2021). Rupp's actions fit this mold. He executed and concealed his fraud using a false broker's license, fictitious account documents, and fake online accounts.

Even so, Rupp responds that the enhancement cannot apply because it impermissibly duplicated his three other offense-level enhancements. Our caselaw has interpreted the Sentencing Guidelines to bar district courts from engaging in "double counting" by relying on identical conduct to impose two separate enhancements. *See United States v. Duke*, 870 F.3d 397, 404 (6th Cir. 2017); *United States v. Farrow*, 198 F.3d 179, 188–95 (6th Cir. 1999). This caselaw requires us to ask two questions: Did "double counting" occur? If so, does the relevant guideline otherwise authorize the double counting? *See Duke*, 870 F.3d at 404.

In Rupp's case, we need not proceed past the first question. No problematic double counting arises when "distinct aspects" of a defendant's conduct trigger distinct enhancements. *See United States v. Battaglia*, 624 F.3d 348, 351 (6th Cir. 2010). And courts have held that the

11

sophisticated-means enhancement targets a distinct aspect of a fraud scheme that typically does not overlap with other enhancements. For example, we and other courts have held that a sophisticated-means enhancement in the tax context does not impermissibly overlap with another enhancement for those who run tax-preparation businesses. *See Daulton*, 266 F. App'x at 389 (collecting cases). Courts have also held that the sophisticated-means enhancement does not overlap with an enhancement for those who lead extensive criminal activity. *See United States v. Sethi*, 702 F.3d 1076, 1080 (8th Cir. 2013); *United States v. Jackson*, 346 F.3d 22, 25–26 (2d Cir. 2003). They have held that it does not overlap with an enhancement for those who use a "special skill" that members of the general public lack. *See United States v. Minneman*, 143 F.3d 274, 283 (7th Cir. 1998); *United States v. Rice*, 52 F.3d 843, 850–51 (10th Cir. 1995). And they have held that it does not overlap with enhancements tied to the number of victims or the amount of the loss. *See United States v. Hatala*, 552 F. App'x 28, 30–31 (2d Cir. 2014) (order); *United States v. Dancer*, 509 F. App'x 915, 918 (11th Cir. 2013) (per curiam); *United States v. Small*, 210 F. App'x 776, 783 (10th Cir. 2006) (order).

The same logic applies here. Rupp's sophisticated-means enhancement did not duplicate the three others that the district court applied. Rupp primarily complains about this enhancement's use in combination with the enhancement for an investment adviser's violation of the securities laws. Yet that separate provision applies only to those who meet the definition of "investment adviser." U.S.S.G. § 2B1.1(b)(20)(A)(iii), cmt. 16(A). And an investment adviser can commit securities fraud merely by lying (triggering only the investment-adviser provision), whereas a noninvestment adviser can use complex means to execute a fraud (triggering only the sophisticated-means provision). *Cf. Daulton*, 266 F. App'x at 389. The two provisions thus apply to distinct aspects of Rupp's fraud. *See Battaglia*, 624 F.3d at 351. Likewise, Rupp's other two

12

enhancements arose because of the magnitude of the loss and the hardship that he caused at least five of his victims. *See* U.S.S.G. § 2B1.1(b)(1)(J), (2)(B). These provisions also target different aspects of Rupp's fraud. After all, a complex fraud can target a single victim, and a simple fraud can cause a large loss. Since these provisions account for "harms" "different" from the sophisticated-means enhancement, the district court did not engage in double counting by applying all of them. *Hatala*, 552 F. App'x at 30 (citation omitted); *see Dancer*, 509 F. App'x at 918.

Analogizing to the child-pornography context, Rupp counters that the sophisticated-means enhancement applies in nearly every fraud case and so fails to treat more culpable defendants more severely. Appellant's Br. 17. But Rupp's own data shows that the enhancement applies in only about 35% of securities-fraud cases. *See* U.S. Sentencing Commission, *What Does Federal Economic Crime Really Look Like?*, at 19 (Jan. 30, 2019). Besides, the reality that an enhancement applies frequently says nothing about whether its use in combination with other enhancements amounts to impermissible "double counting." As we have said in the child-pornography context on which Rupp relies, an enhancement that targets a distinct harm is perfectly legitimate no matter how often it arises. *See United States v. Lynde*, 926 F.3d 275, 280 (6th Cir. 2019). And one could reasonably conclude that the use of sophisticated means to engage in fraud causes greater harm by, for example, making it more difficult to detect. *Cf. Daulton*, 266 F. App'x at 389.

3. *Substantive Reasonableness*. Rupp lastly challenges his sentence as substantively unreasonable. But the appeal waiver in his plea agreement bars this argument. Defendants may waive the constitutional right to appeal a sentence as long as they waive that right knowingly and voluntarily. *See United States v. Riccardi*, 989 F.3d 476, 489 (6th Cir. 2021); *United States v. Moon*, 808 F.3d 1085, 1088–90 (6th Cir. 2015); *cf. United States v. Mosley*, 53 F.4th 947, 967 (6th Cir. 2022). Here, Rupp signed a plea agreement that unambiguously "waive[d] all rights to appeal"

his "sentence" except on a few specified grounds. Plea Agreement, R.6, PageID 20–21. As one of the few exceptions, the agreement allows him to assert a substantive-reasonableness challenge *only* if the district court chose a sentence that was "above the Guidelines range as determined by the court at sentencing[.]" *Id.*, PageID 21. Because Rupp's 192-month sentence falls comfortably within his range, this narrow exception does not apply. Rupp thus may not challenge his sentence as substantively unreasonable under the appeal waiver that he agreed to.

Rupp attempts to avoid this unambiguous waiver by alleging that he did not knowingly and voluntarily enter the plea agreement. But he makes no arguments unique to the appeal waiver. The record leaves no doubt that he knowingly agreed to that specific provision. During his plea hearing, the magistrate judge explained to Rupp that he was agreeing to "give up" his right to appeal his sentence unless the district court chose an above-guidelines prison term. Tr., R.26, PageID 76–77; *see* Fed R. Crim. P. 11(b)(1)(N); *United States v. Johnson*, 530 F. App'x 406, 409–10 (6th Cir. 2013). Rupp instead merely reincorporates the general argument that his entire plea was unknowing and involuntary because of the government's mistaken sentencing estimate. That argument fails for the reasons that we have already explained.

We affirm.