UNITED STATES of America,
Plaintiff–Appellee,

v.

Michael R. MARTIN and Ronald D. Lowder, Defendants–Appellants.

Nos. 98–2621, 98–2967.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 10, 1999.

Decided Nov. 1, 1999.

Patrick J. Chesley, Rodger A. Heaton (argued), Office of the United States Attorney, Springfield, IL, for Plaintiff–Appellee in No. 98–2621.

Frances C. Hulin, Rodger A. Heaton (argued), Office of the United States Attorney, Springfield, IL, for Plaintiff–Appellee in No. 98–2967.

Patrick A. Tuite (argued), Arnstein & Lehr, Chicago, IL, for Defendant–Appellant in No. 98–2621.

D. Peter Wise (argued), Gates, Wise & Schlosser, Springfield, IL, for Defendant–Appellant in No. 98–2967.

Before POSNER, Chief Judge, and EASTERBROOK and ROVNER, Circuit Judges.

POSNER, Chief Judge.

 Martin and Lowder were convicted by a jury of mail fraud, 18 U.S.C. § 1341, and Martin with giving a bribe in connection with a federally funded program, § 666(a)(2), and Lowder both with receiving such a bribe, § 666(a)(1)(B), and misapplying government property. § 666(a)(1)(A). Martin was sentenced to 70 months in prison and Lowder to 66 months, and each was also ordered to pay restitution to the Illinois Department of Public Aid of $12.3 million. Their appeals raise a number of issues, only some of which have enough merit to require extended discussion. For example, the argument that an employee of the Department of Public Aid who purloined incriminating documents and gave them to the Illinois State Police was acting as an agent of the state and so violating the Fourth Amendment (made applicable to the states by the Fourteenth) raises purely factual issues as to which it is enough to say that the district court did not commit *clear* error in rejecting the argument. It is true that a district court's answer to the ultimate question whether a private person is actually a government agent, a question that requires the application of a legal concept (agency) to facts, may, after *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), be subject to plenary review by the court of appeals, as we noted in *United States v. Shahid*, 117 F.3d 322, 325 (7th Cir.1997), and assumed without discussion in *United States v. Hall*, 142 F.3d 988, 993 (7th Cir.1998). But the determination of the underlying facts remains subject to the clear-error rule, *Ornelas v. United States, supra*, 517 U.S. at 699, 116 S.Ct. 1657, and the Fourth Amendment issue in this case pivots on such a fact: whether the state police asked the employee to obtain documentary evidence of Lowder's misconduct. The judge thought not, and we cannot say that he committed a *clear* error in so finding. *United States v. McAllister*, 18 F.3d 1412, 1417–18 (7th Cir.1994).

The facts relevant to the principal issue presented by the appeals, viewed, as they must be, as favorably to the verdict as the record permits, are as follows. (Our summary emphasizes Lowder's conduct, as

there was considerably more evidence of Martin's guilt.) The Department of Public Aid administers the Medicaid program in Illinois, which is half funded by the federal government. Lowder worked for a bureau within the department that attempts to reduce Medicaid costs by collecting any private health insurance proceeds to which the Medicaid recipient may be entitled, in order to offset the expense to the Medicaid program. In 1985, the Department hired a contractor to assist with these collections. Martin worked for the contractor and struck up a friendship with Lowder. Five years later Martin bought out the contractor and in effect assumed its contract with the Department. At first when Martin and Lowder socialized they split the expenses, but as time went on Martin picked up a larger and larger share, even after the Department established a policy that employees should not accept gifts from the Department's contractors. In 1993 and 1994 particularly, Martin (or in some instances Ladd, an alleged coconspirator who was, however, acquitted) fairly showered Lowder with gifts in various forms, including upgrading Lowder's round-trip coach ticket to first class at a cost of more than $2,000 on a trip to Germany, giving him $1,000 to gamble with and $200 to spend at a striptease joint, and giving him almost $900 for the expenses of another trip. Lowder failed to disclose any of these gifts to the Department of Public Aid, as its regulations required him to do since the giver was a contractor with the Department. Martin deducted the gifts as business expenses on his company's income tax returns. On January 1, 1995, Martin hired Lowder away from the Department (he had been dangling the possibility of a job offer before Lowder for at least a year) but continued giving him gifts, including $6,000 for tickets and other expenses related to a trip by Lowder and his girlfriend to the Superbowl. This gift, though received after Lowder went to work for Martin, had been promised before.

The motive for Martin's generosity toward Lowder, as well as for Martin's lavish donations to Governor Edgar's campaign fund and lavish gifts to influence-peddlers, legislators, and executive officials, was to get favorable terms for his company in its dealings with the Department of Public Aid (and also to land other profitable contracts with the state). Lowder was involved in these negotiations and he gave work to the company that the Department could have done itself at lower cost, and he persisted in this even after it was questioned by other employees of the Department. Lowder also went easy on Martin's company when it defaulted on its obligation to load certain data into the Department's computer system, and showed other favoritism to the company.

In 1993 the company successfully sought to amend its contract with the Department. In particular, it got the Department to agree to pay it $350 every time it identified an insurer of a Medicaid claimant, even if no money was ever obtained from the insurer; and, what is more, to pay it that amount for 13,000 such identifications that it had made before the contract was amended and had been compensated for under the terms of the original contract. As Lowder well knew, $350 was at least ten times what the identification was worth, and much more than the existing contract terms entitled Martin's company to. Lowder was directed to prepare a cost estimate for the amended contract. The estimate was that the amendment would cost the Department hundreds of thousands of dollars for no additional benefit, yet Lowder termed it a more equitable payment system than the existing one even though the existing one was much more favorable to the Department and there were no "equities" in favor of the new system. He recommended that the Department adopt it; it was adopted; and in administering it Lowder at first allowed Martin's company to claim $350 for the identification of an insurer even when the "identification" consisted of an entirely trivial change in the Department's records,

such as changing the first name of an insured from "Jim" to "James." Or when it was entering information that was completely worthless to the Department, such as the identification of an insurer more than two years after the medical bill had been paid that the insurance might have covered, when the insurer would not pay claims made more than two years after they accrued; or identifying an insurer that had canceled the insurance before the claim accrued. Even under the amended contract, none of these identifications should have been credited, as Lowder knew.

Furthermore, by concealing the existence of the amended contract from his staff for six months after it was adopted, Lowder prevented the staff from devising procedures that would have made it more difficult for Martin's company to get credit for worthless identifications. Lowder also failed to relay complaints from his staff about the company's performance to his superiors. Audits conducted after the government began investigating the defendants revealed thousands of invalid identifications; the amended contract had cost the Department an additional $12.9 million over the original contract price, causing a net loss to the Department of $12.3 million after offsetting $600,000 that it owed Martin's company for legitimate services. The contract was terminated and a different contractor hired who charged a much lower rate for actual collections from insurers and charged zero for identifying insurers.

■ Lowder's guilt of receiving bribes is not open to serious doubt. A reasonable jury could find that he accepted the gifts and the job from Martin "intending to be influenced or rewarded in connection with any business ... [of the Department of Public Aid] involving anything of value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B). The more difficult question is whether Lauder's failure to advise against the amended contract was a form of mail fraud. Concern has long been expressed that the failure of the mail fraud statute to define "fraud" invites prosecutorial overreaching. E.g., *United States v. Dial*, 757 F.2d 163, 170 (7th Cir.1985); *United States v. Margiotta*, 688 F.2d 108, 143 (2d Cir. 1982) (separate opinion); John C. Coffee, Jr., "The Metastatis of Mail Fraud: The Continuing Story of the 'Evolution' of a White–Collar Crime," 21 *Am. Crim. L. Rev.* 1 (1983). The concern has been exacerbated by Congress's restoration to the mail fraud statute of the "intangible rights" doctrine, 18 U.S.C. § 1346; see *United States v. Bloom*, 149 F.3d 649, 655 (7th Cir.1998), a judicial interpretation of the original statute which the Supreme Court disapproved in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). The doctrine makes it a federal crime to defraud one's employer of his right to one's loyal and honest services. *United States v. Bloom, supra*, 149 F.3d at 655; *United States v. Brumley*, 116 F.3d 728, 733–34 (5th Cir.1997) (en banc); *United States v. Sawyer*, 85 F.3d 713, 723–24 (1st Cir.1996). The government's argument is that if Lowder had been loyal to his employer, the Department of Public Aid—if his loyalty had not been bought by Martin, his benefactor, who was trying to mulct the Department— he would have spoken out against the approval of the amended contract, which he knew would impose heavy costs on the Department with no offsetting benefits.

It is easy to see how the next step in "intangible rights" thinking would be to argue that an elected official who receives a donation to his campaign fund and afterward fails to prevent the donor from obtaining favorable treatment in dealing with the government is defrauding the government of its right to his loyalty. Coffee, *supra*, at 15–17. We are speaking not of a case in which there is either an explicit quid pro quo or even some positive act by the official to assist the donor, but merely of a case in which it can be proved (though this will often be impossible to do with the certitude required in a criminal case) that the official, had he not received the dona-

tion, would have taken positive steps to try to prevent the donor from receiving favorable treatment. For example, a legislator well known for his anti-smoking views, having received a generous donation from a cigarette company, might have muted his opposition to the industry's position. But the courts have made clear that criminal inducement of a legislator to take particular action cannot be inferred from the legislator's acceptance of campaign contributions from interests urging the action, *McCormick v. United States*, 500 U.S. 257, 272, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991); *United States v. Allen*, 10 F.3d 405, 411 (7th Cir.1993); *United States v. Taylor*, 993 F.2d 382, 385 (4th Cir.1993); *United States v. Biaggi*, 909 F.2d 662, 695 (2d Cir.1990), or from his acceptance of lobbyists' hospitality. *United States v. Sawyer, supra*, 85 F.3d at 741–42; *United States v. Woodward*, 149 F.3d 46, 54–55 (1st Cir.1998). The first set of cases involved specific federal criminal prohibitions, such as the prohibition against bribery in federally funded programs that Lowder also violated, but the second set involved the mail fraud statute and we cannot imagine that they would be decided differently if the government decided to prosecute them under the "intangible rights" doctrine. Cf. *United States v. Sun–Diamond Growers*, 526 U.S. 398, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999); Todd E. Molz, Comment, "The Mail Fraud Statute: An Argument for Repeal by Implication," 64 *U. Chi. L. Rev.* 983, 985–86 (1997).

The present case, however, is not one in which the government employee, having received lobbyists' hospitality, gifts, or (if an elected official) campaign contributions, afterward favors or fails to oppose his benefactor. Nor is it a "revolving door" case in which a government employee is "rewarded" for having favored a contractor or regulated firm by being hired by it. This is a case in which a properly instructed jury—the instructions are not challenged—had before it evidence from which it could infer with the requisite certitude

that the government employee had been bribed (including with the implicit promise of a future job in the private sector) to engage in acts within the scope of his employment to assist the person who had bribed him to commit those acts, and as a result deprived his employer of the latter's right to the employee's honest services. E.g., *United States v. Bloom, supra*, 149 F.3d at 656–57; *United States v. Isaacs*, 493 F.2d 1124, 1149–50 (7th Cir.1974) (per curiam); *United States v. Woodward, supra*, 149 F.3d at 54–55.

Besides not questioning the instructions to the jury, Lowder does not challenge either the prosecutor's references in closing argument or elsewhere to the "intangible rights" doctrine or—this is particularly critical—the scope of the doctrine, except to join Martin's cursory argument (if argument it be) that the fiduciary duty the breach of which is charged as mail fraud must have its source in state law, as held in *United States v. Brumley, supra*, 116 F.3d at 734–35. The fear that motivated the *Brumley* decision is that if federal courts are free to devise fiduciary duties the breach of which violates the mail fraud statute, the result will be the creation in effect of a class of federal common law crimes, see *United States v. Bloom, supra*, 149 F.3d at 656, something federal courts have steadily refused to do. *Liparota v. United States*, 471 U.S. 419, 424, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985). *Brumley*, however, is contrary to the law in this circuit, e.g., *United States v. Keane*, 522 F.2d 534, 544–45 (7th Cir.1975); *United States v. Bush*, 522 F.2d 641, 646 n. 6 (7th Cir.1975), and in the other circuits to have addressed the question. *United States v. Sawyer, supra*, 85 F.3d at 726; *United States v. Frost*, 125 F.3d 346, 366 (6th Cir.1997); *United States v. Margiotta, supra*, 688 F.2d at 124; *United States v. States*, 488 F.2d 761, 767 (8th Cir.1973); cf. *Parr v. United States*, 363 U.S. 370, 389, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960).

The question is one of statutory intent. Is the mail fraud statute intended merely to back up state criminal law by denying criminals the use of a federal instrumentality (the postal service) to assist them in committing crimes? Or is it aimed at any fraud that is accomplished through the use of the postal service? The cases we have cited assume that the answer is the latter. Many cases say that the statute reaches "everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future.... It was with the purpose of protecting the public against all such intentional efforts to despoil, and to prevent the post office from being used to carry them into effect, that this statute was passed." *Durland v. United States*, 161 U.S. 306, 313–14, 16 S.Ct. 508, 40 L.Ed. 709 (1896); see also *United States v. Lindsey*, 736 F.2d 433, 436 (7th Cir.1984); *United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir. 1980); *United States v. States, supra*, 488 F.2d at 767. "The mails are a mere jurisdictional hook which permits the prosecution of fraudulent schemes." Ellen S. Podgor, "Criminal Fraud," 48 *Am. U. L. Rev.* 729, 753 (1999). It can be argued that tying the concept of fraud in the mail fraud statute to state law and to federal statutes expressly creating fiduciary duties would allay the persistent concerns about the breadth and vagueness of the statute. Against this it can be argued that a uniform albeit judge-made federal concept of fiduciary duty might do the trick as well or better—but the riposte is that a century of interpretation of the statute has failed to still the doubts of those who think it dangerously vague. The textual arguments deployed in *Sun Diamond Growers* to cabin the gratuity statute may point the way to a narrowing interpretation of the mail fraud statute—or may not, for it can be argued that the considerations deployed in that opinion are not available in interpreting the mail fraud statute, with its sparse text.

We need not pursue this difficult issue further. A litigant who wants us to overrule our previous decisions must do more than cite a recent decision of another court (unless the Supreme Court!) that is to the contrary. In a section of his brief that Lowder joined, Martin cited *Brumley* and in fact quoted the passage in which the Fifth Circuit concluded that the fiduciary duty the breach of which gives rise to federal mail fraud must be grounded in state law. But that is *all* that Martin did—cite the case and quote its conclusion. He did not cite any of the contrary cases or make any argument for why they should be overruled and *Brumley* followed. This waived the point, *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 780–81 (7th Cir.1999), and so we shall adhere to our anti-*Brumley* position for now, but without prejudice to reexamining it without preconceptions should a full argument against it be mounted in a future case.

Lowder argues that his failure to speak out against the contract was due not to the gifts he had received from Martin but either to his honest judgment or, more plausibly, to the fact that "the fix was in." That is, through his extensive courting of higher officials, Martin had obtained passionate support for the amended contract from Lowder's superiors, and so any protest against it would have been futile and might have endangered his job. This is possible but ignores the evidence that Lowder performed such acts (not omissions) on Martin's behalf as arguing to his superiors for the $350 fee per insurer identification that Martin's company sought, plus the even more damning evidence of Lowder's failure to disclose to his superiors the conflict of interest that he had by virtue of receiving expensive gifts from Martin.

The "fix" becomes significant when we turn to the sentence, where the only significant issue is the order of restitution. The $12.3 million loss that the amended contract was found to have

caused the Department of Public Aid was a loss intended by Martin and Lowder within the meaning of the sentencing guidelines and was therefore the appropriate amount for the judge to consider in deciding what prison sentence and fine to impose on each of them. U.S.S.G. §§ 2B1.1, Application Note 2; 2C1.7, Application Note 3; 2F1.1, Application Note 8. Actually, the guidelines do not distinguish between a loss that is intended but not actual in the sense that the scheme did not succeed, and an intended loss that though actual would have occurred regardless of the scheme. But since the guidelines treat both the intended and the actual loss the same, it does not matter in which cubbyhole we place such a loss. For completeness we note that a loss that is neither intended nor caused by the fraudulent scheme—an unintended loss not caused by the defendants' wrongdoing (either the wrongdoing for which they are convicted, or relevant conduct within the meaning of the guidelines)—is not relevant to the determination of the severity of the sentences.

When it comes to restitution under the Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A, however, the existence of a causal relation between the defendant's conduct and the loss that the Act requires him to restore is essential, as assumed in *United States v. Menza*, 137 F.3d 533, 537–39 (7th Cir.1998), and *United States v. Rice*, 38 F.3d 1536, 1540 (9th Cir.1994); cf. *Hughey v. United States*, 495 U.S. 411, 420, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990). Not only does the Act itself confine the right of restitution to "victims" who are "directly harmed" by the defendant's conduct, § 3663A(a)(2); as we have emphasized in upholding the constitutionality of retroactive application of the Act, most recently in *United States v. Szarwark*, 168 F.3d 993, 998 (7th Cir.1999), the Act seeks to engraft a civil remedy onto a criminal statute, giving the victim of the crime the recovery to which he would have been entitled in a civil suit against the criminal and thus merely providing a procedural shortcut rather than imposing a heavier criminal punishment. See also *United States v. Newman*, 144 F.3d 531, 537–42 (7th Cir.1998); *United States v. Nichols*, 169 F.3d 1255, 1279–80 (10th Cir. 1999). This interpretation requires that restitution under the Act be limited to situations in which it could have been obtained in a civil suit. Civil restitution does not require proof of any loss at all, and hence that the defendant caused the loss, when, as is common, the plaintiff is seeking to recover the defendant's gain rather than the plaintiff's loss from the unlawful conduct complained of. But obviously if the plaintiff is seeking to recover his loss from the defendant, he has to prove that the defendant caused the loss. Thus, had the Department of Public Aid brought a civil suit against the defendants to recover the loss which their misconduct caused it, it would have had to show that the loss would not have occurred but for their misconduct. It could not have shown this, certainly with respect to Lowder, because even if Lowder had committed no crimes and spoken out boldly against the amended contract, it almost certainly would have been adopted because of the support for it by Lowder's superiors reaching far up into the legislature and governor's office.

Lowder's lack of causal responsibility is not critical, however. The liability of coconspirators is joint as well as several, *United States v. Pandiello*, 184 F.3d 682, 687 (7th Cir.1999); *United States v. Nichols*, 169 F.3d 1255, 1278 (10th Cir. 1999); *United States v. Ismoila*, 100 F.3d 380, 398–99 (5th Cir.1996), consistent with the general common law rule making joint tortfeasors jointly as well as severally liable for the harm caused by the tort. *Woods v. Cole*, 181 Ill.2d 512, 230 Ill.Dec. 204, 693 N.E.2d 333, 337 (Ill.1998); *In re Uranium Antitrust Litigation*, 617 F.2d 1248, 1257 (7th Cir.1980); *Aetna Casualty Surety Co. v. P & B Autobody*, 43 F.3d 1546, 1564–65 (1st Cir.1994). It is true that Lowder wasn't charged with conspiracy and that under the federal criminal law

of restitution as it existed before the enactment of the Mandatory Victims Restitution Act of 1996 this omission might have been fatal to any effort to impose joint liability on him. See *Hughey v. United States*, 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990). But the Act authorizes restitution for all harm caused by "the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern," provided the defendant is convicted of an offense that has at least one of those features. 18 U.S.C. § 3663A(a)(2). *Nichols*, construing identical language added to the previous federal criminal restitution statute, 18 U.S.C. § 3663(a)(1), imposes joint liability on all participants in the scheme, conspiracy, or pattern. 169 F.3d at 1278. The offense of mail fraud requires proof of a scheme, and the indictment charged Lowder and his codefendants (including of course Martin) with scheming to defraud the state. Lowder's conviction therefore exposed him to joint liability with Martin, and in determining the scope and consequence of the scheme the judge was not limited to the evidence presented at the trial. 18 U.S.C. §§ 3664(d)(4), (d)(6), (e); *United States v. Savage*, 891 F.2d 145, 151 (7th Cir.1989); *United States v. Obasohan*, 73 F.3d 309 (11th Cir.1996) (per curiam). The judge expressly found that Lowder had "assisted MSI [Martin's company to] commit fraud in order to obtain an amendment to a contract which MSI otherwise would not have obtained," and it was the amendment that was the source of the $12.3 million loss. While objecting to the district judge's finding that Martin's misconduct caused the $12.3 million loss, Lowder does not deny joint liability for whatever loss the record shows.

■ It thus becomes critical to determine whether the judge's finding that Martin caused that loss can be sustained. This is where the "fix" bites. Unless Martin's illegal acts pursuant to the scheme to defraud were a causal factor in the award of the amended contract (which was, remember, the immediate cause of the $12.3

million loss), neither he nor Lowder can be ordered to make restitution of the entire loss. On this point we are constrained to find that the district court committed a clear error, necessitating a remand for a redetermination of the amount of restitution. Although Martin's efforts to obtain the amended contract went far beyond what he was able to achieve by bringing Lowder over to his side, most of them, such as the making of large campaign contributions, were legal (though sometimes ethically questionable), and so cannot support a finding that the illegal scheme caused the amended contract and resulting $12.3 million loss. A reassessment of the amount (if any) of the loss that is reasonably attributable to the illegal scheme will therefore be necessary on remand.

■ One loose end remains to be tied up. Before argument we noticed that the defendants' briefs were highly duplicative. Issues common to both were briefed separately, sometimes in identical language, sometimes in close paraphrase. When multiple appellants raise common issues, they should file a single consolidated brief; if any appellant wishes to raise an additional issue, or to disassociate himself from an issue raised in the consolidated brief, he should file a supplemental brief. In this case, the lead brief was filed by Martin's lawyer; and Lowder's lawyer, rather than indicating in a supplemental brief any divergent position, filed a brief largely duplicating that of Martin. When we issued an order to show cause why Lowder's brief should not be rejected, his lawyer revised and resubmitted a proper brief.

■ We require parties to appeals before this court to avoid needless duplication that burdens the court and disserves the client. *United States v. Torres*, 170 F.3d 749 (7th Cir.1999) (per curiam); *United States v. Ashman*, 964 F.2d 596 (7th Cir.1992) (per curiam); cf. 7th Cir. R. 33. We do not think formal disciplinary action required in the circumstances, but we take this opportunity to remind the bar

of its duty to avoid needless duplication in the briefing of multiple-party appeals.

The judgments are affirmed except with respect to restitution, as to which the case is remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART, VACATED AND REMANDED IN PART.