**UNITED STATES of America,
Plaintiff,**

**v.**

**Michael R. MARTIN and Ronald
D. Lowder, Defendants.**

**No. 96–30036.**

United States District Court,
C.D. Illinois,
Springfield Division.

July 28, 2000.

Patrick J. Chesley, Rodger A. Heaton, Springfield, IL, for plaintiff.

Ronald Menaker, Patrick A. Tuite, Chicago, IL, D. Peter Wise, Springfield, IL, for defendants.

## OPINION

RICHARD MILLS, District Judge.

A question of restitution.

How much upon re-sentencing?

## I. BACKGROUND

On November 1, 1999, the United States Court of Appeals for the Seventh Circuit issued an opinion affirming Michael R. Martin's mail fraud (16 counts) and bribery convictions and affirming Ronald D. Lowder's mail fraud (also 16 counts), receiving a bribe, and misapplying government property convictions. *United States v. Martin*, 195 F.3d 961, 970 (7th Cir.1999). The opinion also affirmed Martin's sentence of 70 months of imprisonment and affirmed Lowder's sentence of 66 months of imprisonment. *Id.* However, the Seventh Circuit remanded their case for "[a] reassessment of the amount (if any) of the loss that is reasonably attributable to the illegal scheme . . . ." *Id.* at 969.

After receiving the Seventh Circuit's mandate, this Court ordered the parties to address, in writing, their respective positions regarding the best possible method or formula for complying with the Seventh Circuit's opinion in determining the amount of restitution owed by Martin and Lowder. The parties dutifully complied with the Court's request and, subsequently, agreed that a re-sentencing hearing was unnecessary, choosing instead for the Court to determine the amount of restitution owed based upon the briefs which the parties had submitted.

Martin and Lowder argue that the amount of restitution which they owe is zero because no causal connection exists between their illegal conduct and the actual amount of loss sustained by the Illinois Department of Public Aid (the "IDPA"). Moreover, Martin and Lowder assert that the $350.00 per "hit"[1] rate cannot be employed by the Court to calculate the amount of restitution owed because there was no misconduct in Management Services of Illinois, Inc.'s, ("MSI") obtaining that rate.[2] Finally, Martin and Lowder

---

1. What constituted a "hit" varied during the applicable time period, but it generally referred to the identification of private insurance coverage from which the IDPA (and MSI) could recover.

2. MSI was Martin's corporation through which he obtained the contracts with the IDPA. MSI was named as a co-Defendant and was convicted of mail fraud and giving a bribe.

contend that the labor match project and the credit balance project are irrelevant in calculating the proper amount of restitution owed because restitution is limited to the amount of loss sustained as a result of the awarding of the amended contract.

Alternatively, Martin and Lowder claim that the maximum amount of restitution which they owe is approximately $170,-000.00. Martin argues that the maximum amount of restitution for which he and Lowder should be held accountable is $172,550.00; this amount is based upon an internal audit performed by the IDPA which revealed that MSI double-billed the State for 493 hits. On the other hand, Lowder contends that the maximum amount of restitution which he and Martin should be forced to pay is $171,768.01; this amount is, likewise, based upon an internal audit performed by the IDPA which revealed that the IDPA had overpaid MSI by that amount.[3] Accordingly, Martin and Lowder ask the Court to impose either zero or approximately $170,000.00 in restitution.

The Government argues that the proper amount of restitution owed by Martin and Lowder is $6,300,292.00. The Government contends that the IDPA should be compensated for the losses which it sustained by Lowder's and co-Defendant Curtis Fleming's awarding MSI contracts for work which the IDPA could have performed internally and by Lowder's and Fleming's paying MSI for work which was of little or no value to the IDPA. Specifically, the Government asserts that Lowder and Fleming allowed MSI to perform the labor match and credit balance projects when the projects could have and should have been performed internally by the IDPA. Thus, the Government claims that a causal connection exists between Martin's and Lowder's illegal scheme and a $6,300,292.00 loss to the IDPA:

$10,525,361.00 based upon the labor match program, $180,000.00 based upon the credit balance program, $389,550.00 for overpayments for insurance identifications which were not part of the labor match program (i.e., non-overlap), $127,750.00 for over-billing, and $172,550.00 for double-billing.

## II. APPLICABLE LAW

■ The Victim and Witness Protection Act ("VWPA") is a powerful and expansive statute which provides a remedy for victims of crimes. *United States v. Martin*, 128 F.3d 1188, 1190 (7th Cir.1997). The VWPA requires a district court to "order restitution to each victim in the full amount of each victim's losses ...", 18 U.S.C. § 3664(f)(1)(A), and it "empowers courts to impose restitution as part of a sentence rather than just as a special condition of probation." *United States v. Minneman*, 143 F.3d 274, 284 (7th Cir. 1998).

Because "Congress contemplated that a restitution order might require a district court to resolve complex questions regarding the amount of loss", the VWPA "provides several procedural options for the court to obtain the evidence necessary to determine the amount of restitution ... [and] spells ·out the standards for determining the amount of restitution and the long-term effects of such an order." *Id.* 284 & 285; 18 U.S.C. § 3664(d). The VWPA does not, however, dictate which procedural option must be invoked in each case, deferring instead to the district court's discretion as how best to determine the appropriate amount of restitution to impose. *Minneman*, 143 F.3d at 284.

■ The Seventh Circuit has interpreted the VWPA as limiting restitution "to situations in which it could have been obtained in a civil suit." *Martin*, 195 F.3d at 968. Thus, "the existence of a causal rela-

---

**3.** Martin and Lowder argue that even these audits were flawed because the amounts were derived by using many "edits" which were created by the IDPA's staff which were not approved by their supervisors and because the definition of a "good insurance identification" fluctuated with the whims of the IDPA.

tion between the defendant's conduct and the loss that the Act requires him to restore is essential . . . ." *Id.* The Seventh Circuit has explained that a causal relationship is necessary because

> the Act seeks to engraft a civil remedy onto a criminal statute, giving the victim of the crime the recovery to which he would have been entitled in a civil suit against the criminal and thus merely providing a procedural shortcut rather than imposing a heavier criminal punishment.

*Id.* (citations omitted). The Government bears the burden of demonstrating, by a preponderance of the evidence, the amount of loss sustained by a victim as a result of the defendant's criminal conduct. 18 U.S.C. § 3664(e); *United States v. Menza*, 137 F.3d 533, 537 (7th Cir.1998).

## III. ANALYSIS

### A. *AMOUNT OF RESTITUTION*

In the instant case, the Court believes that it must answer three questions in order to determine the proper amount of restitution to impose upon Martin and Lowder. The *first* question is: has the Government met its burden of demonstrating that Martin's illegal conduct caused the IDPA to lose $6,300,292.00? The Court finds that it has not.

In attempting to sustain its burden, the Government has relied exclusively upon the actions of Lowder and Fleming in obtaining the IDPA's work for MSI and in keeping a lid on the situation as the cash flowed MSI's way. For example, regarding the labor match project (which constitutes the majority of the $6.3 million which the Government seeks as restitution), the Government blames Lowder and Fleming for retaining the work for MSI when the IDPA could have performed the project internally. Likewise, the Government faults Lowder and Fleming for transferring the credit balance program to MSI, after which time the IDPA's voluntary recoveries dropped by $900,000.00 and the

amount which MSI claimed as recoveries increased by about the same amount.

However, the Seventh Circuit has made it clear that Lowder's conduct cannot be considered by this Court in calculating the amount of restitution owed to the IDPA. In its opinion remanding this case for a re-determination of the amount of restitution owed, that court opined:

> But obviously if the plaintiff is seeking to recover his loss from the defendant, he has to prove that the defendant caused the loss. Thus, had the Department of Public Aid brought a civil suit against the defendants to recover the loss which their misconduct caused it, it would have had to show that the loss would not have occurred but for their misconduct. *It could not have shown this, certainly with respect to Lowder, because even if Lowder had committed no crimes and spoken out boldly against the amended contract, it almost certainly would have been adopted because of the support for it by Lowder's superiors reaching far up into the legislature and governor's office.*

*Martin*, 195 F.3d at 968 (emphasis added). In addition, the Seventh Circuit stated:

> It thus becomes critical to determine whether the judge's finding that Martin caused that loss can be sustained. This is where the "fix" bites. Unless *Martin's* illegal acts pursuant to the scheme to defraud were a causal factor in the award of the amended contract (which was, remember, the immediate cause of the $12.3 million loss), neither he nor Lowder can be ordered to make restitution of the entire loss.

*Id.* at 969 (emphasis added).

Thus, this Court cannot rely upon Lowder's actions in determining the amount of restitution to impose; the focus, according to the Seventh Circuit's opinion, is upon Martin's illegal acts. *Id.* Because the Government's brief relies almost exclusively upon Lowder's conduct in support of its suggested $6.3 million restitution amount,

the Court is compelled to find that the Government has not met its burden of demonstrating that a $6.3 million loss to the IDPA can reasonably be attributed to the illegal scheme.

The *second* question is: may the Court consider the conduct of Fleming in determining whether the Government has met its burden of demonstrating a $6.3 million loss to the IDPA? The Court concludes that it may not.

Although Fleming, as a co-Defendant, may be held jointly and severally liable for restitution, *Id.* at 968 (citing cases), the Court believes that Fleming is in much the same position as Lowder: even if he had spoken out against the amended contract, his protestations would have been futile. True, Fleming was Lowder's superior (at least for a time), but the Court does not believe that he was high enough in the IDPA's food chain to have put a stop to the IDPA's losses. As the Seventh Circuit noted, Martin's and MSI's "influence reached far up into the legislature and the governor's office." *Id.*

The Seventh Circuit also noted that "the award of the amended contract (... was ... the immediate cause of the $12.3 million loss) ...." *Id.* at 969. Like Lowder, Fleming had no control over the terms or the awarding of the amended contract. In fact, the Government admits in its brief that neither Fleming nor Lowder determined the rate at which MSI would be paid under the amended contract.

■ The issue with which this Court has struggled in determining the appropriate amount of restitution to impose is: how far up must it go in the IDPA's chain of command to find a causal connection between the loss which the IDPA sustained and Martin's criminal conduct? The Seventh Circuit's opinion was silent on this issue. Originally, this Court believed that a causal connection could be established for the entire $12.3 million loss based upon the illegal actions of all of the scheme's participants, including Lowder. In this

Court's opinion, Lowder's influence must have carried some weight within the IDPA; otherwise, why would Martin have bribed him?

The Seventh Circuit disagreed, forcing this Court to decide whose influence was it necessary for Martin to have captured in order to be awarded the amended contract. But without being able to discern the hearts of men, the Court does not believe that this task can be accomplished, at least not to the tune of the $6,300,292.00 which the Government seeks. In this Court's view, each participant (the named co-conspirators, unnamed co-conspirators, and others) added his own influence within the IDPA in order for MSI to be awarded the amended contract. Exactly whose influence constituted "the fix", however, has not been demonstrated by the Government by a preponderance of the evidence, and therefore, the Court cannot say that a causal connection exists linking Martin's illegal conduct to a $6.3 million loss based upon Fleming's testimony which has been cited by the Government in its brief.

The *final* question is: does any causal relationship exist between Martin's conduct and the IDPA's loss? The Court believes that such a relationship does exist.

As the Court noted *supra,* Martin was a major shareholder in MSI, and MSI was Martin's co-Defendant. Thus, any actions taken by MSI may be attributed to Martin. During the trial, Brett A. Finley, CPA, testified that he performed an audit of MSI's work with the IDPA. This audit revealed that the IDPA had overpaid MSI $171,768.01. *See* Gov't Ex. R–35. The Court believes that the only possible explanation for this boon to MSI is that the monies received were as a result of the illegal scheme in which Martin bought influence from State officials.

As the Court understands it, Government Exhibit R–35 (which is a contract review audit performed by the IDPA dated May 1997) includes all but two of the categories which the Government has listed in its brief for which it seeks restitution.

Specifically, Government Exhibit R–35 includes the amount for the retroactive payment of the 13,000 hits, the amount for non-labor match hits referred to by the Government as non-overlap, the amount of the over-billing of the 365 hits, and the amount of the double-billing of the 493 hits. After crediting MSI for work performed, the IDPA's audit establishes that the IDPA had overpaid MSI in the amount of $171,768.01. The Court believes that this is the only amount for which the Government has demonstrated a causal connection between Martin's illegal conduct and a loss to the IDPA.

The Court does not believe that it can find a causal connection between Martin's illegal conduct and the labor match project or the credit balance project. The evidence at trial revealed that MSI did reduce the back log in the labor match project. Thus, the IDPA received a benefit from MSI's work on this project, not a loss.

Likewise, the Court does not believe that a causal connection exists for the credit balance project. Although the IDPA may have been able to perform the credit balance project in house, the IDPA did receive a benefit from MSI's work on the project. The Government has offered no evidence-other than the wrong-doings of Lowder and Fleming-to establish a causal link between Martin's illegal conduct and the credit balance project.

Accordingly, the Court finds that the only causal connection which exists between Martin's illegal conduct and the loss to the IDPA is $171,768.01 as established by the IDPA's internal audit introduced at trial as Government Exhibit R–35.

## B. *APPORTIONMENT OF RESTITUTION*

■ After determining the amount of restitution to which a victim is entitled, the VWPA requires a district court to appor-

tion liability for the amount of loss among the defendants, assuming, of course, that the district court finds that more than one defendant contributed to the victim's loss. 18 U.S.C. § 3664(h); *United States v. Walton,* 217 F.3d 443, 451–52 (7th Cir.2000). As is the case in determining the amount of loss, the VWPA gives the district court great latitude in apportioning the amount of loss among the defendants. "[T]he court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h). The district court must then specify the manner and schedule in which the restitution is to be paid, keeping in mind the financial resources of the defendants, their projected earnings and income, and their financial obligations. 18 U.S.C. § 3664(f)(2) & (3).

■ In the instant case, the Court finds that restitution should be imposed jointly and severally among Martin, Lowder, MSI, and Fleming. 18 U.S.C. § 3664(h). While it is true that Martin received the lion's share of the profits, the illegal scheme could not have been accomplished without Lowder's assistance, and Lowder did receive rewards for his assistance in the illegal scheme in the form of trips, cash, and job prospects. Thus, the Court believes that restitution should be shared jointly and severally to ensure that the victim (*i.e.,* the IDPA) is fully compensated for its loss.

As for the schedule of payment of restitution, the Court orders that restitution be paid in a single, lump sum payment within the imposed period of supervised release.[4] The Court sentenced both Martin and Lowder to a three year term of supervised release. The Court believes that this time period is sufficient for them to make

---

4. In making this determination, the Court has considered Martin's and Lowder's financial condition as set forth in their Presentence

Investigation Reports as well as the other considerations set forth in this Order.

amends for the loss which they caused the IDPA. Both Martin and Lowder will still be of working age when they are released from the custody of the Bureau of Prisons. Moreover, both have demonstrated a good work ethic and the capability of engaging in substantial gainful employment. Thus, although they will have a felony conviction on their record, the Court is convinced that they will be able to obtain gainful employment upon their release from incarceration which is sufficient to pay the imposed restitution within their imposed period of supervised release.[5]

*Ergo,* Defendants Michael R. Martin and Ronald D. Lowder are ordered to pay $171,768.01 in restitution to the Illinois Department of Public Aid. This amount is owed jointly and severally with each other, with Curtis G. Fleming, and with Management Services of Illinois, Inc. In all other respects, the Court's prior judgment and sentences remain unchanged.

---

5. If Martin and Lowder want to make periodic payments, they may do so. However, restitution must be paid-either *via* a cumulation of their periodic payments or *via* a lump sum payment-by the end of the imposed period of supervised release.