# In the

# United States Court of Appeals

## For the Seventh Circuit

————————

Nos. 02-4222 & 02-4224

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ROBERT T. MITRIONE and MARLA A. DEVORE,

*Defendants-Appellants.*

————————

Appeals from the United States District Court
for the Central District of Illinois.
No. 00-CR-30021—**Jeanne E. Scott**, *Judge.*

————————

ARGUED SEPTEMBER 22, 2003—DECIDED FEBRUARY 9, 2004

————————

Before ROVNER, EVANS, and WILLIAMS, *Circuit Judges.*

EVANS, *Circuit Judge.* Dr. Robert T. Mitrione, a psychia-trist, and Marla A. DeVore, his office manager, were in-dicted on charges of Medicaid and Medicare fraud. The alleged fraud involved billing for services that were not provided (ghost billing), overstating what services were provided (upcoding), and billing for services provided by others but declaring that Dr. Mitrione provided the service (substitute billing). The bulky indictment charged Mitrione and DeVore with one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, eight counts of mail fraud, in violation of 18 U.S.C. § 1341, five counts of filing false claims, in violation of 18 U.S.C. § 287, and one

count of health care fraud, in violation of 18 U.S.C. §§ 1347 and 2. After one of the mail fraud counts was dismissed, a jury, after a 3-week trial, convicted Mitrione of everything except two of the counts and DeVore on 10 of the 14 counts against her. After the verdict, the defendants filed a motion for new trial based on newly discovered evidence claiming that a government witness committed perjury during the trial. The district court judge found that perjury indeed occurred and that it affected all of the defendants' counts of conviction except the two that only involved substitute billing. A new trial was ordered for all but these two counts, but the government decided not to retry the case. Mitrione was sentenced to a term of 23 months and DeVore to 15 months. Restitution for each was set at $11,255.65. Mitrione and DeVore appeal, raising a number of issues, but we will mention only those that have arguable merit. Before getting to that, we begin with the facts, with an emphasis on the "substitute billing" charges. And the facts, as they must be at this stage of the case, are presented in the light most favorable to the verdict.

Dr. Mitrione established a psychiatric practice in Springfield, Illinois, in the early 1990's. With his wife, Cecelia, who was his assistant at the time, he learned the billing aspect of the business. In 1991, Mitrione applied to become a Medicaid provider with the Illinois Department of Public Aid (IDPA), the agency that administers the program in Illinois. Both Mitriones received IDPA billing training, which included the handling of forms and CPT[1] codes. Dr. Mitrione also received an IDPA provider manual for physicians and signed an IDPA agreement which included specific requirements for billing Medicaid. He agreed to

---

[1] CPT refers to "Current Procedural Terminology." CPTs are listed in a book of codes used for medical billing which is published by the American Medical Association.

comply with all current and future policy provisions as set forth in the applicable medical assistance handbooks. At the time, one policy provided that physicians could not be paid under Illinois Medicaid for psychiatric services provided by employees under their supervision. The handbook for physicians provided:

> The provision of psychiatric services is limited . . . and must be *personally* provided by the physician who submits charges. Services provided by a psychologist, social worker, etc. are not reimbursable.

Mitrione also enrolled as a provider with the Medicare Part B system, which, like Medicaid, is a "fee for service" program. Under certain circumstances, Medicare (unlike Illinois Medicaid) allows providers to delegate certain psychological services to others in their employ. Medicare regulations require those services to be (1) medically necessary; (2) an integral yet incidental part of a physician's professional service; (3) commonly provided in a physician's office; (4) either rendered without charge or included in the physician's bill; (5) representative of an expense incurred by the physician or nonphysician in his or her professional practice; (6) performed under the direct supervision of the physician, nonphysician, or physician-directed center; and (7) initiated or managed by the employing physician.

The Medicare manual states that to fulfill the "direct supervision" requirement, a physician—not a proxy—must be present in the same office so he can intervene in case an emergency arises. The Medicare rules did not allow payment for the services of unlicensed mental health providers, even if a physician was in the area when the service was provided.

In 1992, Mitrione expanded his practice to include patient care at the Mental Health Center of Central Illinois (MHC), a state-funded, nonprofit mental health clinic in Spring-

field. Mental health clinics funded by the State of Illinois differ from private physician practices. Specifically, these clinics are permitted to bill Medicaid for nonphysician services.

In September 1994, the Mitriones fell behind in their billing. It was at that time that Mitrione brought Marla DeVore, a counselor whom he met at MHC, into his practice as a new office manager. He also moved his office to another site and renamed it Mitrione and Associates (M&A). Mitrione and DeVore apparently got along well— they were married in 2001 (Mitrione and Cecelia were divorced in 1997) after the indictment in this case was returned.

When she came on board, DeVore recruited Shari McGowan, a nurse at the MHC, to help her set up a billing system. DeVore taught McGowan how to enter billing information on M&A's computer.

DeVore and Mitrione designed a "superbill" which contained the five codes primarily used in the practice. Typically, the doctor or a therapist who provided the service placed his name on the superbill and added a checkmark next to the code to indicate the service provided. The superbills, therefore, provided essential information that M&A employees used to prepare claim forms. The evidence at trial disclosed that soon after Mitrione and DeVore became aware of official inquiries into their billing practices, they ordered the destruction of several years worth of superbills.

Mitrione and DeVore instituted a policy to bill IDPA for the services of nonphysicians and caused their billing clerks to substitute Mitrione's name for that of a nonphysician on the claim forms sent to IDPA. To do this, the clerks changed the name of the service provider when manually filling out the IDPA billing forms.

DeVore reviewed the claims before they were sent to Medicare, IDPA, or various insurance companies. She also reviewed rejected claims and instructed McGowan how to rebill. If McGowan had a problem with a CPT code or with a billing issue that DeVore could not resolve, she asked Mitrione what to do.

In 1995, Mitrione hired a few nonphysicians to provide services to M&A's clientele. For example, he hired a social worker, Dana Ingram, and counselors Ron Havens and Cathy Walters. When those employees quit, he hired Terry Kuethe Goff, an unlicensed intern who was working to complete requirements for an advanced psychology degree, and Walter Woods, a drug and alcohol counselor.

Woods had been a director of Gibralter, Ltd., a failing drug and alcohol rehabilitation center in Springfield. Certain drug and alcohol centers qualify for a special certification from the State of Illinois similar to the provision for mental health facilities. Through this certification, a center may submit billings for nonphysician counselors working under the supervision of a physician. During this time, however, there was a moratorium that precluded additional drug and alcohol certifications of this type in Sangamon County, where Springfield is located.

Over the next several months, Mitrione, DeVore, and Woods made several unsuccessful attempts to secure the drug and alcohol counseling licenses and billing privileges that belonged to Gibralter and to obtain similar licenses and billing privileges for their own practice. The Gibralter Medicaid certificate was ultimately terminated, and M&A was unable to obtain authority to bill Medicaid for nonphysician drug and alcohol services.

Since Woods held only an alcohol and drug counseling certificate, he was not licensed to provide mental health services. Both defendants knew they could not bill Medicaid for Woods' services. Nevertheless, shortly after the

Gibralter transfer was denied, Woods' role was expanded by assigning him Medicaid clients. Mitrione and DeVore directed him to counsel patients with diagnoses other than drug and alcohol addition. Goff objected to both Mitrione and DeVore, saying that Woods was acting beyond his certification. Mitrione and Devore also assigned Goff a full caseload of Medicaid and Medicare clients, despite her lack of license and private clinical experience.

The essence of the substitute billing charges was that Mitrione and DeVore assigned Medicaid and Medicare patients to counselors and therapists for treatment and then billed as though Mitrione either provided the service himself or directly supervised the service.

Shortly after she joined M&A, DeVore asked Sheryl Walters, a billing employee with MHC, how M&A could bill Medicaid for counselors' or therapists' services. Walters explained that M&A could not bill for those services because it was not a licensed not-for-profit mental health clinic. Shortly thereafter, Walters told Mitrione the same thing when he inquired about billing for therapists. During an advanced IDPA seminar, which Mitrione attended in October 1996, it was confirmed that Medicaid would not pay for psychiatric services performed by non-physicians.

In the spring of 1996, M&A formed a therapy group for the survivors of sexual abuse (SOSA). The group was made up of women who survived sexual trauma, molestation, or rape in their childhood. Neither DeVore nor Goff, who initially ran the group, were licensed to practice in this area.

The first SOSA group meeting was held in May 1996. Because of the abuse suffered by members of the group, they were often fragile and volatile and, as a result, discussions during the sessions were at times personal and painful. According to a psychiatric expert, if not handled carefully, the group members could have been hurt further.

Shortly after the program started, DeVore and Mitrione assigned Woods to co-facilitate the SOSA group sessions with Goff. When Goff objected that Woods was unqualified to co-lead the group, they reminded her that she was a "supervisee," that is, an intern who needed Mitrione's supervision for her advanced degree and eventual license. Goff nevertheless complained weekly to Mitrione that Woods' actions and demeanor in the group were inappropriate.

Woods, too, told both DeVore and Mitrione that certain therapy sessions were beyond his training levels, though he continued with them. He was even assigned to do individual therapy with some members of the group. He also handled several group sessions by himself. The defendants then billed as if Mitrione had provided the service. Some of these billings for Woods were signed and submitted by DeVore.

In addition to billing IDPA, Mitrione and DeVore billed Medicare for Woods' work with the SOSA group and counseling of clients. Medicare would not have paid for the service if it knew that the group was being run by a drug and alcohol counselor with no other licensing, certification, or education. Even if Goff had been in the group with Woods, Medicare would not have paid because Goff was not licensed and Mitrione was not present in the office and available to intervene if an emergency arose.

Unlike their defense to the ghost billing and upcoding charges—that they were simply inept billers—the defendants defended the substitute billing charges by claiming ignorance of the rules. Mitrione claimed that he did not receive the physicians handbook, or that he tossed it away without reading it. DeVore, on the other hand, claimed that she was unaware the handbook existed. In addition, both Mitrione and DeVore claimed that Gary Vaughn (who died before the trial), an IDPA representative, told them that the substitute billing practice was acceptable.

The evidence, however, demonstrated that Mitrione received the physicians handbook (which contained the billing prohibition) at least three times: (1) when he first enrolled as a provider; (2) when he was trained; and (3) when he attended an IDPA seminar in October 1996. Additionally, Mitrione pointed to the manual in his office when interviewed by investigators.

Moreover, neither defendant mentioned to the investigators that Vaughn had sanctioned their substitute billing practices. In December 1999, Mitrione phoned the IDPA Office of Inspector General to inquire about the investigation and to try to convince investigators that any billing issues were the work of a former employee. Mitrione never suggested at that time that Vaughn sanctioned the improper billing methods that were used. Nor could Mitrione explain why the issue even came up with Vaughn, since DeVore and he claimed that they did not know about the prohibition against billing for nonphysician services.

We turn now to the defendants' claim that the perjury at trial tainted their convictions on the substitute billing counts. During the rebuttal phase of the trial, the government offered the testimony of Deanna Statler, an IDPA auditor. She presented a summary which included information about the frequency of ghost billing and upcoding. Mitrione (DeVore, unless otherwise noted, joins all of these arguments, and our references from now on to "Mitrione" apply to both defendants), in defense, claimed that the ghost billing and upcoding were just mistakes, but Statler testified that these "mistakes" were almost always in the defendants' favor. The implication of this testimony was that the defendants were lying because if they had just been mistaken, there would have been as many mistakes against their interests as there were in their favor.

Statler's testimony, however, was not the truth, the whole truth, and nothing but the truth. She claimed she counted certain things herself when doing her audit, but she actually had others do much of it for her. She said she excluded some numbers from her calculations but hadn't, which made the numbers look worse for the defendants than they really were. This perjury, reasoned Judge Scott in the district court, entitled the defendants to a new trial on most, but not all the counts upon which they were convicted. We review the decision to deny the new trial motion on two of these counts for an abuse of discretion. *United States v. Westmoreland*, 240 F.3d 618, 637 (7th Cir. 2001).

In determining whether a new trial is warranted when a witness presented by the government has lied, we have traditionally used a test adopted 75 years ago in *Larrison v. United States*, 24 F.2d 82 (7th Cir. 1928). Under the *Larrison* test, new trials are granted when (1) the witness is material and the testimony false; (2) the jury *might* have reached a different verdict if it knew the testimony was false or if it hadn't heard the testimony; and (3) the defense was taken by surprise by the false testimony or didn't learn of its falsity until after trial.

This old test puts our circuit at odds with other circuits which, absent a finding that the government knowingly sponsored the false testimony, require a defendant seeking a new trial to show that the jury would *probably* have reached a different verdict had the perjury not occurred. *See, e.g., United States v. Williams*, 233 F.3d 592 (D.C. Cir. 2000); *United States v. Huddleston*, 194 F.3d 214, 217-21 (1st Cir. 1999); *United States v. Provost*, 969 F.2d 617, 622 (8th Cir. 1992); *United States v. Petrillo*, 237 F.3d 119, 123 (2nd Cir. 2000); *United States v. Krasny*, 607 F.2d 840, 844-45 (9th Cir. 1979); *United States v. Sinclair*, 109 F.3d 1527, 1532 (10th Cir. 1997). *But* see *United States v. Lofton*, 233 F.3d 313 (4th Cir. 2000); *Gordon v. United States*, 178 F.2d

896, 900 (6th Cir. 1949). We even criticized the *Larrison* test a dozen years ago. *See United States v. Mazzanti*, 925 F.2d 1026, 1029 (7th Cir. 1991).

Today, we overrule *Larrison* and adopt the reasonable probability test.[2] In order to win a new trial based on a claim that a government witness committed perjury, assuming as in this case that the government did not knowingly present the false testimony, defendants will have to prove the same things they are required to prove when moving for a new trial for other reasons. Defendants will have to show that the existence of the perjured testimony (1) came to their knowledge only after trial; (2) could not have been discovered sooner with due diligence; (3) was material; and (4) would probably have led to an acquittal had it not been heard by the jury. *See United States v. Gonzalez*, 93 F.3d 311 (7th Cir. 1996).

The defendants argue that Statler's false testimony was material and that it tainted their convictions on the substitute billing counts because it "tipped the scales" against them. However, Statler did not testify about the propriety of substitute billing or the defendants' knowledge that such claims were prohibited. Rather, she testified about the frequency of ghost billing and upcoding. Statler's summary included services rendered by therapists other than Mitrione, but it did not comment on whether those services were reimbursable. So Statler was really not a material witness with respect to the substitute billing counts.

Nevertheless, the defendants claim that Statler's testimony demolished their credibility, and without it the jury might have reached a different verdict. We disagree. For

---

[2] Pursuant to Circuit Rule 40(e), this opinion has been circulated among all the judges of this court in regular active service. No judge favored a rehearing en banc on the question of overruling *Larrison v. United States*.

one thing, the evidence against Mitrione and DeVore on all counts, without Statler's testimony, was strong. The government also presented substantial evidence that the defendants knew they were engaging in impermissible substitute billing. Having reviewed this record, we do not believe that the jury would have probably reached a different verdict on the substitute billing counts had Statler's testimony not been presented. And, we add, our review of the record would not lead us to conclude that the jury would have probably reached a result other than guilty on the upcoding and ghost billing counts had it not heard Statler's rebuttal testimony.

We turn next to the defendants' claim that the district court erred in not granting a new trial because the prosecutor referred to the September 11 terrorist attacks in his closing remarks. Closing arguments were supposed to begin on September 11, 2001, but they were delayed a day because of the attacks. On September 12, the prosecutor began his closing argument with this statement:

> Ladies and gentlemen. Good morning. Our job just got harder in the last 24 hours. We're already facing an incredibly difficult task as we've done for the last three and a half weeks trying to sort this out. It's now made more difficult by the events of yesterday, the devastation that terrorism has brought to our country. But that's why we need to do this today. That's why we got out of bed today and came here. The very institutions that these people seek to undermine must continue.

The district court overruled a defense objection to this remark, saying the defendants would also have a chance to comment briefly on the events of the day before. The prosecutor then continued:

> One of those systems is the system of justice. And that's one of our most important systems in the country, and that's something that we've all been a part of the last

three and a half weeks. Every one of us. And that's why we need to redouble our efforts today to concentrate, to stay on task, to get back to pay attention to the evidence, no matter how hard it is after yesterday. What we do today is important. It is important certainly to Dr. Mitrione and Ms. DeVore. But it's important to the fiscal integrity of the Medicare program and Medicaid program and the medical assistance programs. It is important to our system of justice.

Mitrione's attorney began his closing with the following remarks:

Now, [the prosecutor] this morning tried to draw some analogy or some connection between the events of yesterday and this case. I think he has lost all sense of proportion and prospective [sic]. And I don't want to minimalize or trivialize the destruction of yesterday by drawing any connection with this case. There's no connection.

DeVore's attorney also commented on the prosecutor's remarks, saying "[o]ther counsel have commented there are a lot of things going on in the world right now, but the most important thing in the world going on as far as Marla DeVore is your deliberations and what you think about her conduct."

We consider claims that a prosecutor has tainted a trial with improper remarks under a two-step inquiry. *See United States v. Renteria*, 106 F.3d 765, 766 (7th Cir. 1997). We first consider the remarks in isolation. If they are improper in the abstract, we then consider them in the context of the entire record and ask whether they denied the defendant a fair trial. Only if the remarks undermined the fairness of the proceedings will we overturn a conviction.

There is nothing in the remarks by the prosecutor here that would warrant a move to the second step of our inquiry. Even viewed in isolation, the prosecutor's remarks were not improper. In fact, given the horrific events of September 11, we think it would have been strange indeed if anyone connected with this trial and allowed to speak to the jury on September 12—judge, prosecutor, or defense counsel—failed to briefly comment on the attacks. The prosecutor's words were about terrorists and the need to get back to business despite the devastating attacks. They were not improper.

The defendants also argue that the Illinois statutes underlying their convictions for Medicaid and Medicare fraud are in conflict with, and therefore preempted by, federal law. Judge Scott rejected this argument when it was raised in the context of a motion to dismiss the substitute billing counts of the indictment, finding that it ignores basic rules of statutory construction and the State of Illinois' discretion to adopt standards for its medical assistance programs. We agree with Judge Scott's treatment of this issue and have nothing to add to it. *See United States v. Mitrione*, 160 F. Supp. 2d 993 (C.D. Ill. 2001).

We now turn to two sentencing issues—one an enhancement and the second a challenge to the restitution order. Judge Scott imposed a 2-level obstruction of justice enhancement under U.S.S.G. § 3C1.1 on both defendants after finding that they testified falsely at the trial. DeVore contends that she did not testify falsely and that the district court clearly erred in imposing the enhancement. Mitrione says, in his main brief, that he adopts the arguments in DeVore's brief; DeVore's brief, however, neither mentions Mitrione's obstruction enhancement nor argues that it was improper. The government's brief pointed this out, and Mitrione's reply brief ignores the point. So, as to him, this argument is waived or, more charitably, rejected as not developed.

Our review of obstruction of justice enhancements is "very limited." *United States v. Ramunno*, 133 F.3d 476, 480 (7th Cir. 1998). The determination that DeVore obstructed justice is a factual finding which we will not disturb unless it is clearly erroneous. To meet this standard, DeVore must convince us "to a certainty that the district court's factual findings were incorrect; merely suggesting the possibility of error is not enough." *Id.* at 480-81 (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). This is an especially daunting task here as the district court's factual finding is based on an assessment of credibility, and we give special deference to the trial judge's unique opportunity to follow the case up close, here for more than 3 weeks.

DeVore repeatedly testified that she was not the biller for M&A. Judge Scott found that DeVore testified that, prior to 1997, she played no role in billing except to fold, mail, and sign the bills. The judge found that DeVore's testimony was contradicted by several witnesses at trial, implicitly found those witnesses to be more credible, and concluded that DeVore testified falsely. Now, rather than argue that her statements at trial were mistaken or the result of confusion, she maintains that her testimony was truthful and claims that the government presented no contrary testimony. We reject this claim.

As the district court found, several witnesses, including McGowan, Goff, Woods and others, established through their testimony that DeVore "orchestrated the billing processes throughout that office." These witnesses testified that DeVore instructed them on how to:  (1) bill; (2) interpret codes; (3) resubmit bills that had been rejected; and (4) change the listed service date on a bill to avoid rejection of a bill for a second service on one date.

So, while DeVore maintains that her testimony was true, her claim simply cannot be squared with the evidence. In

light of the testimony, the district court properly found that DeVore's statements that prior to 1997 she played no significant role in billing were false.

The district court also properly found that the testimony was material to the counts of conviction because its purpose was to mislead the jury into thinking DeVore had no decisionmaking authority in billing when clearly she did. *See United States v. Freitag*, 230 F.3d 1019, 1025 (7th Cir. 2000) (district court's finding that Medicare fraud defendant's testimony was "a creative revision of what had happened" sufficiently found intent required to support perjury-based sentence enhancement).

DeVore also claims that the district court clearly erred in finding that she testified falsely when she said she did not participate in the decision to have Woods lead the SOSA group. While DeVore states that "no contrary testimony was offered," Judge Scott found that her testimony was contradicted by Woods, Mitrione, and Goff. Applying an obstruction enhancement to DeVore's guideline range was not error.

Finally, the defendants argue that Judge Scott erred in ordering them to reimburse Medicare because, according to them, the victim of their fraud (if in fact there was a fraud) was Medicaid. At sentencing, however, the defendants did not object to the restitution order on the ground that they now advance, *i.e.*, that Medicaid—not Medicare— was the victim of their fraud. Instead, they argued that the district court improperly calculated the amount of restitution owed. In fact, the defendants contended that the total loss to Medicare was $2,144.58 and that Medicaid should be paid nothing. So, on this record, they forfeited the issue, and our review is only for plain error. *United States v. Randle*, 324 F.3d 550, 555 (7th Cir. 2003).

Since Mitrione and DeVore were convicted of fraud, Judge Scott's authority to impose restitution is governed by the

Mandatory Victim Restitution Act (MVRA) codified at 18 U.S.C. § 3663A and 18 U.S.C. § 3664. The relevant portions of the MVRA provide:

> (a)(1) Notwithstanding any other provision of law, when sentencing a defendant . . . the court shall order, in addition to . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense . . . .
>
> (2) For the purposes of this section, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense *that involves as an element a scheme, . . . any person directly harmed by the defendant's criminal conduct in the course of the scheme . . . .*

18 U.S.C. § 3663A(a)(1)-(2) (emphasis added). Thus, while restitution is limited to the counts of conviction, when the counts of conviction involve a scheme, restitution may be ordered for all of the harm caused by the defendant's criminal conduct in the course of the scheme. *See Randle*, 324 F.3d at 556; *United States v. Martin*, 195 F.3d 961, 967 (7th Cir. 1999).

Based upon Judge Scott's finding that the total loss caused by the defendants' fraud was $11,255, she ordered the defendants to pay restitution in that amount. We see no plain error in this order. As the judge found, both Medicaid and Medicare were victimized by the defendants' fraud, and a restitution order need not be limited to those harmed by the conduct that formed the basis for a conviction. To the contrary, the statute defines "victim" as any person directly harmed by the defendant's criminal conduct in the course of the scheme. *Martin*, 195 F.3d at 967. *See Randle*, 324 F.3d at 556 ("restitution is authorized under the MVRA . . . to a victim who is directly harmed by the offender's conduct

in the course of committing an offense that involves *as an element* a scheme . . . .").

Here, the defendants were convicted of one count of mail fraud and one count of filing false claims. These counts adopted parts of counts 1 and 2, which charged the defendants with devising a scheme to defraud the Medicaid and Medicare programs of the State of Illinois and the United States. Thus, they were convicted of offenses which triggered the broad definition of "victim" under the MVRA quoted above. Thus, because the defendants' crime included a scheme, and there is evidence that the scheme directly harmed a victim, *i.e.*, Medicare, other than the victim mentioned in the counts for which the defendants were convicted, *i.e.*, Medicaid, Judge Scott did not plainly err in ordering restitution to Medicare.

For these reasons, the judgment of the district court is AFFIRMED.

A true Copy:

      Teste:

                                    _____
                                    *Clerk of the United States Court of*
                                    *Appeals for the Seventh Circuit*